Michael T. Hensley (#031952001)
BRESSLER, AMERY & ROSS
A Professional Corporation
325 Columbia Turnpike
Florham Park, New Jersey 07932
P.O. Box 1980
Morristown, New Jersey 07962
(973) 514-1200

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
### (Camden Vicinage)

| | |
|---|---|
| BRANDON GORDON, CURTIS GREEN, JAKUB VONDRAK, JESSE LOBB, BYRON MCDONALD, DEREK PIPER, CHRISTOPHER GALIDO, MARK BOEHLER, MERLIN FISHER-LEVINE, NATHANAEL FLACHSBART, JAMES KOLONUSZ, and RUSS HENDERSON, | **Civil Action No. 14-cv-7495 (JHR)(JS)** |
| Plaintiffs, | |
| v. | **SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |
| ZACHARY DAILEY, and LAB RAT DATA PROCESSING, LLC, | |
| Defendants. | |

Plaintiffs Brandon Gordon, Curtis Green, Jakub Vondrak, Jesse Lobb, Derek Piper, Christopher Galido, Mark Boehler, Merlin Fisher-Levine, Nathanael Flachsbart, and Russ Henderson (individually and collectively, "Plaintiffs"), through undersigned counsel, hereby sue Zachary Dailey, and state as follows:

## NATURE OF ACTION

1.      Plaintiffs' claims arise out of Defendant's sale of securities in violation of Section 12(a)(1) and 12(a)(2) of the Securities Act of 1933 ("1933 Act"), codified at 15 U.S.C. § 77*l*; and Defendant's misrepresentations in connection with the sale of securities in violation of Section 10(b) of the Securities Exchange Act of 1934 ("1934 Act") and Rule 10b-5 promulgated thereunder, codified at 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5, respectively (the "Federal Claims"). Plaintiffs also assert state law claims against Defendant arising out of the same operative facts as the Federal Claims for violations of the New Jersey Uniform Securities Law, N.J. Stat. Ann. §§ 49:3-47, *et. seq.*; violations of the Florida Securities and Investor Protection Act, Fla. Stat. § 517.301; common law fraud; negligent misrepresentations; fraudulent inducement; breach of contract; and unjust enrichment (the "State Law Claims"). As set forth in greater detail below, the Court has original jurisdiction over some of the State Law Claims and has supplemental jurisdiction over the others.

## PARTIES

2.       Plaintiff Brandon Gordon ("Gordon") is an individual and a citizen of the State of Florida, and is *sui juris*.

3.      Plaintiff Curtis Green ("Green") is an individual and a citizen of the State of Utah, and is *sui juris*.

4.      Plaintiff Jakub Vondrak ("Vondrak") is an individual and a citizen or subject of the Czech Republic, and is *sui juris*.

5.      Plaintiff Jesse Lobb ("Lobb") is an individual and a citizen or subject of New Zealand, and is *sui juris.*

6.     Plaintiff Derek Piper ("Piper") is an individual and a citizen of the State of Indiana, and is *sui juris*.

7.     Plaintiff Christopher Galido ("Galido") is an individual and a citizen of the State of Michigan, and is *sui juris*.

8.     Plaintiff Mark Boehler ("Boehler") is an individual and a citizen of the State of Tennessee, and is *sui juris*.

9.     Plaintiff Merlin Fisher-Levine ("Fisher-Levine") is an individual and a citizen of the State of New York, and is *sui juris*.

10.    Plaintiff Nathanael Flachsbart ("Flachsbart") is an individual and a citizen of the State of Maine, and is *sui juris*.

11.    Plaintiff Russ Henderson ("Henderson") is an individual and a citizen of the State of Missouri, and is *sui juris.*

12.    Former Defendant Lab Rat Data Processing, LLC, d/b/a Lab Rat Mining ("LRM"), is a New Jersey limited liability company with its principal place of business located in Ocean, New Jersey.  This Court administratively terminated LRM as a Defendant in this action, without prejudice, on November 18, 2015 (D.E. 81) because LRM filed a voluntary bankruptcy petition in the case styled *In Re Lab Rat Data Processing, LLC*, No. 15-198010-CMG, in the United States Bankruptcy Court for the District of New Jersey. LRM's bankruptcy case apparently remains pending.[1]

13.    Defendant Zachary Dailey ("Dailey") is an individual and a citizen of the State of New Jersey, and is *sui juris*. At all relevant times, Dailey was and is the sole controlling member, manager, and employee of LRM and held himself out as its "CEO." Dailey was and is directly

---

[1] Plaintiffs reserve the right to move for leave of this Court to reassert claims against LRM upon a showing of good cause and upon the lifting of the automatic stay in that bankruptcy action.

and vicariously responsible and liable for all acts and/or omissions of LRM complained of herein; Dailey directed LRM to commit those acts and/or omissions; and Dailey personally engaged in and benefitted from those acts and/or omissions.

## JURISDICTION AND VENUE

14.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because multiple claims set forth herein arise under the laws of the United States, specifically 15 U.S.C. § 77*l*, 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5, as alleged more specifically below. In addition, the Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because this action is between parties of diverse citizenship and the amount in controversy exceeds $75,000.00, as described more specifically below. Plaintiffs also invoke the supplemental jurisdiction of this Court to determine the State Law Claims pursuant to 28 U.S.C. § 1367.

15.     Venue in the District of New Jersey is proper pursuant to 28 U.S.C. § 1391(b) because Dailey resides in New Jersey and because a substantial part of the events or omissions giving rise to the claims occurred in New Jersey.[2]

16.     This Court has personal jurisdiction over Dailey because he is domiciled in New Jersey.

## FACTS COMMON TO ALL COUNTS

17.     This action arises from a series of related transactions and occurrences in which Dailey marketed and sold "bonds" issued by LRM (the "LRM Bonds") to each of the individual Plaintiffs through general solicitation efforts over the Internet.

---

[2] This lawsuit was originally brought in the United States District Court for the Middle District of Florida, Tampa Division, and was assigned case number 14-CV-2091-JDW-AEP.  Defendants Dailey and LRM moved to transfer the case to this Court, and eventually, Plaintiffs agreed to the transfer, which was memorialized in an Order dated December 2, 2014.  (D.E. 20).

18.     Beginning in at least June 2013, Dailey engaged in direct and indirect solicitation of each of the Plaintiffs to participate in an "initial public offering" (the "LRM Offering") by purchasing the LRM Bonds. The LRM Bonds related to Bitcoin currency ("Bitcoin").

19.     Dailey engaged in general solicitation or general advertising efforts in offering securities to the public, including non-accredited investors.

20.     Dailey made no attempt to register such securities or comply with legal requirements for any exemption under the federal securities laws or any applicable state securities laws, as evidenced by the statements in the offering materials and the absence of any filing with the SEC or any state securities agency.

21.     Pursuant to Section 5 of the 1933 Act, codified at 15 U.S.C. § 77e, it is unlawful for any person, directly or indirectly, to offer securities to the public in interstate commerce without an effective registration statement with the SEC. Dailey had not filed a registration statement with the SEC at the time of his offer or sale of LRM Bonds to the Plaintiffs.

22.     Alternatively, even if Dailey and LRM were conducting a limited offering exempt under the securities laws they still would have been required to comply with specific exemption requirements related to general solicitation or general advertising offerings, such as Regulation A, which requires the issuer to file an offering circular with the SEC, or for offers made on or after September 23, 2013, with Regulation D, which sets forth rules for general solicitation offerings and mandates that they be made only to accredited investors.  In this instance, Dailey and LRM failed to comply with either Regulation A or Regulation D because they failed to file an offering circular with the SEC and offered the LRM Bonds to non-accredited investors.

23.     Although LRM adopted the term "bonds" in its offering materials to describe the investment opportunity, the LRM Bonds are not bonds in the traditional sense.  Nonetheless, as

explained below, the LRM Bonds are securities within the purview of federal and state securities laws.

### A.      Explanation of Bitcoin Currency and "Mining"

24.      Bitcoin is a virtual currency that is exchanged to purchase goods and services if the seller is willing to accept it.  As the SEC has explained in its enforcement actions against companies that have sold Bitcoin-mining investments, virtual currency is not issued or guaranteed by any jurisdiction or government, and its value is decided by consensus within the community of users of the virtual currency.[3]

25.      Although Bitcoin is not backed by any government entity and is not recognized as legal tender by any government, Bitcoin can be exchanged for traditional forms of currency such as the United States dollar, and Internet-based exchanges exist for that purpose.

26.      Bitcoin is considered to be intangible personal property, at least for some purposes.  For example, the Internal Revenue Service has recognized that "[f]or federal tax purposes, virtual currency is treated as property."[4]  Similarly, the Commodity Futures Trading Commission has determined that Bitcoins are commodities within the meaning of the Commodity Exchange Act.[5]

---

[3] *SEC v. Garza*, No. 3:15-cv-01760-JAM, D.E. #1 (D. Conn.).

[4] I.R.S. Notice 2014-21, Section 4, *available at* https://www.irs.gov/pub/irs-drop/n-14-21.pdf.

[5] *Coinflip, Inc.*, CFTC Docket No. 15-29 (Sept. 17, 2015), http://www.cftc.gov/idc/groups/public/@lrenforcementactions/documents/legalpleading/enfcoinfliprorder09172015.pdf.

27.     The number of Bitcoins that can exist is capped at 21 million.  As of July 13, 2016, 15,756,925 of those Bitcoins were in circulation.[6]  Additional Bitcoins are generated and placed into circulation through a process known as "mining."

28.     Briefly stated, the Bitcoin mining process works as follows.  As people exchange Bitcoins with each other over the Bitcoin network, someone needs to keep track of the transactions.  As the SEC has described the process in federal court, "the bitcoin network collects all transactions made during a set time period, usually around ten minutes, into a list called a 'block.'"[7] People known as "miners" then utilize specialized software to solve complex algorithms to validate the transactions in the block and place them into the "blockchain," which is essentially a public ledger of all transactions in Bitcoin.[8]  The first miner to successfully complete the task of confirming the transactions and writing them into the general ledger is rewarded with a preset amount of newly-issued bitcoins by the bitcoin protocol—in other words, the successful miner earns a designated number of new Bitcoins as compensation.[9] As the SEC has described the process, Bitcoin "self-generate[s] units of the currency by rewarding miners with newly created coins when they are the first to solve the algorithms that validate transactions in the currency."[10]

---

[6] http://www.coindesk.com/price.

[7] *SEC v. Garza*, No. 3:15-cv-01760-JAM, D.E. #1 (D. Conn.).

[8] *Id.* For a general discussion of blockchain technology, see *What Blockchain Is and What It Can Do*, Wall St. J., June 19, 2016, http://www.wsj.com/articles/what-blockchain-is-and-what-it-can-do-1466388185.

[9] CoinDesk, a leading Bitcoin information service, has published a detailed explanation of the mining process in layman's terms. *How Bitcoin Mining Works*, COINDESK.COM, http://www.coindesk.com/information/how-bitcoin-mining-works/ (last visited July 7, 2016).

[10] *SEC v. Garza*, No. 3:15-cv-01760-JAM, D.E. #1 (D. Conn.).

29.     Given that Bitcoins are awarded only to the first miner to solve the algorithm, miners compete with one another and speed is of the essence.  The speed with which a miner can mine Bitcoins is determined by computer processing power, and specialized computer equipment and software has emerged for this purpose. Processing power is measured by the computer's "hash rate," which refers to the number of calculations that the computer can perform per second. For example, a "hash rate" of 100MH/s means that the computer can perform 100 million calculations per second.[11]

30.     In order to increase their chances of being the first to solve the algorithms and earn Bitcoins, miners commonly form teams known as "pools" that allow them to combine their computing power.  Once earned, the Bitcoins are then distributed to the pool members.  LRM's business model involved participation in a mining pool.

31.     Between June 24, 2013 and January 14, 2014, the range of dates in which Dailey solicited Plaintiffs and secured their investments, the exchange rate of U.S. dollars to Bitcoins fluctuated between a low of $63.32 per Bitcoin and a high of $1,095.20 per Bitcoin.  As of July 13, 2016, the exchange rate (measured in terms of the opening price at which Bitcoins were traded) was approximately $664.84 per Bitcoin.[12]

---

[11] *Id.*; https://www.bitcoinmining.com/faq/#what-does-mhs-ghs-mean.

[12] The exchange rates referenced throughout this Complaint were obtained from historical price information available on CoinDesk, a leading website for Bitcoin-related information. *See* http://www.coindesk.com/price/. The exchange rates available on the CoinDesk website are actually aggregated from multiple Bitcoin currency exchanges in order to arrive at a representative, average exchange rate.

**B.     The LRM Bonds are Securities Subject to Federal and State Securities Laws**

32.     Despite the false and misleading written representations made by Dailey and LRM in the offering materials, the LRM Bonds constitute securities that are subject to federal and state securities laws and regulation.

33.     The definition of a "security" includes not only a "bond" but also an "investment contract."   Securities Act of 1933, § 2(1), 15 U.S.C. § 77b(a)(1).   The term "investment contract" is not defined under the Act, but "for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise."   *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946).   Under the litmus test established by the *Howey* case, an investment contract exists and is subject to securities law regulation "if the following elements are established: (1) an investment of money, (2) a common enterprise, and (3) the expectation of profits to be derived solely from the efforts of others."   *Mehl v. Office of Fin. Regulation*, 859 So. 2d 1260, 1262 (Fla. 1st DCA 2003).

34.     The investment scheme orchestrated by Dailey and LRM called for Plaintiffs to invest money in a common enterprise, the LRM Bonds, with profits to come solely from the efforts of Dailey and LRM.[13]   Plaintiffs had no control over LRM's operations or its profit-

---

[13] 15 U.S.C. §77b(a)(1); 15 U.S.C. § 78c(a)(10); *SEC v. Edwards*, 540 U.S. 389, 393 (2004) (An "investment contract" is any investment scheme that "involves an investment of money in a common enterprise with profits to come solely from the efforts of others.").

generating activities, and the various documents and agreements that Dailey created gave no such rights to Plaintiffs.[14]

35.     The SEC has brought multiple civil actions against issuers of Bitcoin-related contracts similar to the LRM Bonds and has taken the position that such investments are "investment contracts" and therefore "securities" within the meaning of the 1933 Act and the 1934 Act.[15]

36.     According to the SEC's Office of Investor Education, fraudsters are attracted to schemes involving virtual currencies because the transactions are not subject to the same regulatory oversight as conventional currencies.  "Any investment in securities in the United States remains subject to the jurisdiction of the SEC regardless of whether the investment is made in U.S. dollars or a virtual currency.  In particular, individuals selling investments are typically subject to federal and state licensing requirements."  *See* SEC Office of Investor Education and Advocacy, Investor Alert: Ponzi Schemes Using Virtual Currencies, SEC Pub. No. 153 (7/2013) attached hereto as **Exhibit 1**.

### C.     Dailey's Solicitation and the LRM Bond Offering

37.     On July 6, 2013, Dailey published an "Official Announcement" on two Bitcoin-related Internet forums, https://bitcointalk.org (the "Bitcointalk Forum") and https://forums.butterflylabs.com (the "Butterfly Labs Forum") (collectively, the "Forums"),

---

[14] The characterization of the LRM Bonds as investment contracts subject to federal and state securities laws and regulation does not depend on the nature or function of Bitcoin itself because all that is necessary is the existence of a common enterprise into which Plaintiffs have invested, with profits to come solely from the efforts of others.

[15] *SEC v. Garza*, No. 3:15-cv-01760-JAM (D. Conn.) (SEC alleged that "Hashlet" contracts were investment contracts, where the contracts entitled investors to a share of the profits that the defendants would purportedly earn by mining Bitcoin); *SEC v. Shavers*, No. 4:13-CV-416 (E.D. Tex.) (SEC obtained judgment after establishing that investment of Bitcoins into Bitcoin-selling enterprise in expectation of receiving returns constituted an investment contract).

publicly offering LRM Bonds for sale.   The Official Announcement advised of Dailey's intention to sell 100,000 LRM Bonds "during the IPO."   In the Official Announcement, Dailey falsely represented that "[t]his company and the PMB's [Perpetual Mining Bonds] being offered are not regulated by any governmental entities including the SEC or any other agency or board." A true and correct copy of the LRM Official Announcement, as posted on the Forums, is attached hereto as **Composite Exhibit 2**.

38.     Thus, Dailey admitted in the LRM Official Announcement to making no attempt to register such securities or to comply with the law providing for any exemption.

39.     On July 15, 2013, Dailey published on the Forum a summary of the details of the LRM Offering (the "Summary").  A true and correct copy of the Summary is attached hereto as **Exhibit 3**.

40.     In furtherance of his scheme, and in an effort to induce Plaintiffs to purchase LRM Bonds, Dailey presented each Plaintiff with a business plan (the "LRM Business Plan").  A true and correct copy of the LRM Business Plan is attached hereto as **Exhibit 4**.

41.     In a further effort to induce Plaintiffs to purchase LRM Bonds, Dailey also presented each Plaintiff with a standardized "Official Contract" in connection with their purchases of LRM Bonds (the "Official Contract"). A true and correct copy of the Official Contract is attached hereto as **Exhibit 5**.

42.     Although the Official Contract was formed and issued at the times of purchase of the LRM Bonds, Plaintiffs were not provided with any Official Contract executed by Dailey, and the form of the Official Contract, which Dailey drafted, provided no space for party signatures. Nonetheless, Dailey led Plaintiffs to believe that their investments in LRM Bonds were subject to the terms and conditions of the Official Contracts.

43.     Dailey also required certain early investors to execute an Initial Investor Contract whereby the potential investor would pledge a certain number of Bitcoins in exchange for a certain number of LRM Bonds.  The purpose of the Initial Investor Contract was to gauge the level of investor interest.  Two Initial Investor Contracts executed by Plaintiff Gordon are attached hereto as **Composite Exhibit 6**.  Plaintiff Gordon did not actually purchase his LRM Bonds pursuant to the Initial Investor Contracts, however.

44.     The most attractive component of the LRM Bonds was the promise of dividends yielded from the Bitcoin mining activities.  Throughout the offering materials and contracts, Dailey and LRM touted the dividends to be paid to investors of the LRM Bonds.  Dailey falsely represented to the Plaintiffs that dividends were a natural by-product of the investment in the LRM Bonds.

45.     For example, Dailey and LRM represented without equivocation in their Business Plan (Exhibit 4) that "Each share will receive 100MH/s* worth of mining profit in dividends on a weekly basis."  They repeated their misrepresentations regarding the promised dividend payouts for investors in the LRM Bonds in the "Official Contract" (Exhibit 5), stating as follows:

> Lab Rat Data Processing, LLC, a NJ company, operating under the trade name, LabRatMining [sic] is a company that will be operating as a mid to large scale miner for Bitcoins paying out dividends/returns to bondholders . . .
>
> ****
>
> Dividends:
>
> Dividends are to be paid out weekly on Saturdays around 12 noon (Eastern Time UTC − 5:00)
>
> ****
>
> Dividends/Bond Value – Each bond will receive a minimum of 100MH/s* worth of mining profit in dividends/returns (all dividends are intended as contractual

returns based on investment and may simply be referred to as dividends for future purposes) on a weekly basis.

In an incorporated Memorandum entitled, "Why LabRatMining?" Dailey and LRM stated that "Returns on investments are not guaranteed." However, this statement was contradicted by the representations in the other offering materials that Dailey and LRM supplied to Plaintiffs.

46.     Dailey and LRM also induced Plaintiffs to purchase the LRM Bonds with false representations that dividend payouts would increase with each new installment of LRM Bond offerings in the future and by claiming that dividend payouts would be more lucrative for the early investors of the LRM Bonds, stating as follows in the Business Plan (Exhibit 4):

> *Plans for Expansion – The IPO will result in 10TH/s being controlled and paid out by LabRatMining on a weekly basis.
>
> The next installment will be offered up in shares at the beginning of the week following the second issuing of dividends after the IPO is complete . . . This installment will add another 15TH/s to the companies [sic] mining operation, and with it will follow an increase in dividend payout to 166.67MH/s per share. This not only gives the new investors an increase in dividend payment, but gives greater benefits to the initial and early investors.
>
> The third installment will likely be a mimic of the second installment increasing the company's total hashrate to 40TH/s which will in turn bump the dividend payout to 200MH/s per share.
>
> Installments in the operation will continue to occur which will provide more value to the company as well as more value to each individual share as the company matures. These expansions will likely grow in size which will provide further payout in the form of dividends to investors.

47.     Another way that Dailey and LRM lured unsuspecting investors such as Plaintiffs into their fraudulent investment scheme was to falsely represent Dailey's dedication to the enterprise and the stability of LRM, stating in the Business Plan that

> My loyalty is to that of every investor in this company, and I would like to include a few formal promises to my investors:

●     Under no circumstances other than, Bitcoin mining becoming 100% illegal, the collapse of Bitcoin, my death, or at a minimum 10 years of successful business, I WILL NOT dissolve this company.

●     This is my full-time job and I will do everything in my power to maintain the integrity of this company.

●     I will be mining in a private/semi-private pool at all times to provide the greatest uptime of mining possible.

●     As future installments are put in place, there will be multiple hosting locations to prevent total loss in case of natural disaster.

●     I will be insuring this equipment for the sake of the company and it's [sic] investors.

48.     Similarly, Dailey and LRM boasted in the Official Contract that "LabRatMining plans to expand mining operations to maintain a presence in the mining community for years to come."

49.     Based upon the offering materials supplied by Dailey and LRM, the LRM Bonds seemed like a sound investment opportunity to Plaintiffs. Dailey and LRM had promised to make dividend payouts, pay all operating costs, and pay greater percentages of dividends with future offerings of LRM Bonds. The only disclosed risk to an investment in the LRM Bonds was the possibility that Bitcoins would depreciate in value. As explained herein, that risk never materialized because the value of Bitcoin has grown exponentially since the time of Plaintiffs' initial investments.

50.     In reality, LRM was a start-up business that was incorporated in New Jersey on June 18, 2013 and operated out of Dailey's residence. Dailey was 21 years old at the time. Despite their "formal promises" to the investors, LRM filed for Chapter 7 bankruptcy protection on May 26, 2015, less than two years after Dailey and LRM started their investment scam.

51.     Notwithstanding Dailey's creation and publication of the foregoing documents, Dailey did not register the LRM Bonds with the SEC or with any state regulatory agency, nor did

he meet any other applicable requirements in connection with the LRM Offering to secure any exemption from registration.

52.     Despite Dailey's representations that the LRM Bonds were outside the purview of government regulation, he admitted in a Bitcointalk Forum post on July 23, 2013 that the LRM Bonds were "securities." Specifically, he advised investors as follows: "I discussed this with my lawyer over a month ago and I believe that due to these securities being offered to a limited amount of people and/or institutions, as well as being limited in size, they do not have to comply with the SEC unless they are falsely representing their business." Dailey's own legal counsel would advise him sometime prior to March 8, 2014 that he could face criminal charges in connection with the LRM Offering if he did not change the terms of the agreements with Plaintiffs and the other investors. Additionally, when questioned by investors in March 2014, Dailey admitted that "[t]here are 94 pages of [New Jersey laws] that pertain to this matter, let alone the federal laws."

53.     Dailey had a statutory obligation, and owed Plaintiffs a duty, to disclose and provide truthful information concerning the LRM Bonds in connection with the LRM Offering, and to comply with the requirements for disclosure in registration statements.

54.     Had Dailey and LRM complied with SEC disclosure requirements for the LRM Offering or the offering circular requirements under Regulation A, Plaintiffs would have been in a substantially better position to make an informed decision about the investment in the LRM Bonds.  The omission of such required information would have been considered material to a reasonable investor and was material to each of the Plaintiffs.

55.     The omission of information on the risk factors, description of LRM's business and operations, audited financial statements, and various other items required pursuant to SEC

regulations was misleading to each of the Plaintiffs. Had Dailey made the required disclosures, Plaintiffs would not have purchased the LRM Bonds.

56.     In order to induce Plaintiffs to invest in the LRM Bonds, Dailey made numerous misrepresentations of fact that were directed to Plaintiffs individually and collectively.

57.     No effort was made by Dailey or LRM to ascertain whether each of the Plaintiffs was a sophisticated investor able to make his own investment decisions or whether each of the Plaintiffs satisfied the definition of an accredited investor.

58.     Dailey required that all investments be made in the form of Bitcoins.  To make their investments in the LRM Bonds, some of the Plaintiffs sent or sold U.S. dollars or mining equipment to Dailey in exchange for Bitcoins, which then were used to purchase LRM Bonds.

**(i)     Solicitation of Plaintiff Brandon Gordon**

59.     On June 18, 2013, Dailey sent Plaintiff Gordon an email in which he described the LRM Offering, attached a preliminary version of the Business Plan, and solicited Plaintiff Gordon to participate in the LRM Offering. Thereafter, and following numerous additional email solicitations to Gordon, Dailey again solicited Gordon to participate in the LRM Offering by making the following misrepresentations of material fact on the Forums on July 6, 2013:

(a)     That each LRM Bond offered to Plaintiffs constituted a right to a proportional share of the Bitcoins generated through LRM's purchase and operation of specialized Bitcoin-mining computer hardware;

(b)     That Plaintiffs would be entitled to receive weekly dividends resulting from the Bitcoin mining operations managed by LRM and Dailey based on the guaranteed minimum hash rates, and that the dividends would increase as additional LRM Bonds were sold; and

(c)     That LRM and the LRM Bonds were not regulated by any governmental entities such as the SEC or any other agency or board, and that the LRM Offering and LRM Bonds complied with all legal and regulatory requirements.

60.     In addition to the foregoing misrepresentations communicated in the Official Announcement, and as part of an effort to induce Plaintiff Gordon's investment, Dailey misrepresented to Gordon in an email dated July 14, 2013 that the value of Gordon's investment could increase by 300% within a month and that "hundreds" of people had "begged" Dailey to invest in LRM Bonds. In a different email to Gordon that same day, Dailey claimed to have already sold at least 20,000 LRM Bonds. In an email to Gordon dated July 17, 2013, Dailey also "guarantee[d] a minimum 10MH/s per bond increase" above the previously guaranteed 100MH/s dividend for every 20,000 LRM Bonds sold.

61.     In reasonable and justifiable reliance on the foregoing material misrepresentations, Plaintiff Gordon purchased 100 LRM Bonds on July 16, 2013 with ten Bitcoins, purchased another seven LRM Bonds on August 15, 2013 with 1.05 Bitcoins, and traded equipment valued at 249.92 Bitcoins for another 1,562 LRM Bonds on August 15, 2013. Thus, in total, Plaintiff Gordon purchased 1,669 LRM Bonds for 260.97 Bitcoins.

62.     Based on the exchange rates between Bitcoins and U.S. dollars on the dates of purchase, Plaintiff Gordon invested the equivalent of $25,396.25 (USD) into LRM Bonds as a result of the foregoing misrepresentations.

63.     The value of Bitcoins has appreciated significantly since the dates of purchase. For example, as of July 13, 2016, the exchange rate between Bitcoins and U.S. Dollars is $664.84 per Bitcoin.  Accordingly, the dollar value of the Bitcoins that Gordon originally invested in the LRM Bonds equates to roughly $173,503.29 (USD) as of July 13, 2016.

64.     Plaintiff Gordon received dividends from the LRM Bonds until May 24, 2015, albeit in increasingly smaller amounts that did not include the previously guaranteed increases. The dividends were paid in the form of Bitcoins, and Plaintiff Gordon received 46.78218949 Bitcoins worth $18,360.27 (USD) based on the prevailing exchange rates at the time of the distributions.

65.     After taking into account the dividends he received from the LRM Bonds, Plaintiff Gordon has lost the use and enjoyment of 214.18781051 Bitcoins valued at $142,400.62 as of July 13, 2016.

### (ii)     Solicitation of Plaintiff Curtis Green

66.     On August 15, 2013, Dailey solicited Plaintiff Green to participate in the LRM Offering by making the following misrepresentations of material fact, both on the Butterfly Labs Forum and via email:

(a)     That each LRM Bond offered to Plaintiffs constituted a right to a proportional share of the Bitcoins generated through LRM's purchase and operation of specialized Bitcoin-mining computer hardware;

(b)     That Plaintiffs would be entitled to receive weekly dividends resulting from the Bitcoin mining operations managed by LRM and Dailey based on the guaranteed minimum hash rates, and that the dividends would increase as additional LRM Bonds were sold; and

(c)     That LRM and the LRM Bonds were not regulated by any governmental entities such as the SEC or any other agency or board, and that the LRM Offering and LRM Bonds complied with all legal and regulatory requirements.

67.     In reasonable and justifiable reliance on the foregoing misrepresentations, Plaintiff Green purchased 1,971 LRM Bonds for 337 Bitcoins on September 24, 2013.

68.     Based on the exchange rates between Bitcoins and U.S. dollars on the date of purchase, Plaintiff Green invested the equivalent of $41,295.41 (USD) into LRM Bonds as a result of the foregoing misrepresentations.

69.     However, on December 1, 2013, Plaintiff Green sold 390 of his LRM Bonds for 19.5 Bitcoins, leaving Green with a total of 1,581 LRM Bonds.  Based on the applicable exchange rate on the date of sale, Green received the equivalent of $18,465.01 from the proceeds of the sale of 390 LRM Bonds.

70.     The value of Bitcoins has appreciated significantly since the date of purchase. For example, as of July 13, 2016, the exchange rate between Bitcoins and U.S. Dollars is $664.84 per Bitcoin.  Accordingly, the dollar value of the Bitcoins that Green originally invested in the LRM Bonds equates to roughly $224,051.08 (USD) as of July 13, 2016.

71.     Plaintiff Green received dividends from the LRM Bonds until May 24, 2015, albeit in increasingly smaller amounts.  The dividends were paid in the form of Bitcoins, and Plaintiff Green received 26.65148443 Bitcoins worth $15,251.02 (USD) based on the prevailing exchange rates at the time of the distributions.

72.     After taking into account his sales of the LRM Bonds and the dividends he received from the LRM Bonds, Plaintiff Green has lost the use and enjoyment of 290.84851557 Bitcoins valued at $193,367.73 as of July 13, 2016.

**(iii)     Solicitation of Plaintiff Jakub Vondrak**

73.     On July 6, 2013, Dailey solicited Plaintiff Vondrak to participate in the LRM Offering by making the following written misrepresentations of material fact on the Forums:

(a)    That each LRM Bond offered to Plaintiffs constituted a right to a proportional share of the Bitcoins generated through LRM's purchase and operation of specialized Bitcoin-mining computer hardware;

(b)    That Plaintiffs would be entitled to receive weekly dividends resulting from the Bitcoin mining operations managed by LRM and Dailey based on the guaranteed minimum hash rates, and that the dividends would increase as additional LRM Bonds were sold; and

(c)    That LRM and the LRM Bonds were not regulated by any governmental entities such as the SEC or any other agency or board, and that the LRM Offering and LRM Bonds complied with all legal and regulatory requirements.

74.    In reasonable and justifiable reliance on the foregoing misrepresentations, Plaintiff Vondrak purchased 999 LRM Bonds (almost exclusively through BitFunder) between August 13, 2013 and January 27, 2014 and traded equipment valued at $1,299 to LRM for an additional 125 LRM Bonds on September 22, 2013. Thus, in total, Plaintiff Vondrak purchased 1,124 LRM Bonds through a series of 83 transactions.  Plaintiff Vondrak purchased these LRM Bonds for 124.742 Bitcoins plus the equipment that was valued at 18.75 Bitcoins, for a total investment of 143.492 Bitcoins.

75.    Based on the exchange rates between Bitcoins and U.S. dollars on the dates of purchase, Plaintiff Vondrak invested the equivalent of $22,422.69 (USD) into LRM Bonds as a result of the foregoing misrepresentations.

76.    The value of Bitcoins has appreciated significantly since the date of purchase. For example, as of July 13, 2016, the exchange rate between Bitcoins and U.S. Dollars is

$664.84 per Bitcoin.  Accordingly, the dollar value of the Bitcoins that Vondrak originally invested in the LRM Bonds equates to roughly $95,399.22 (USD) as of July 13, 2016.

77.     Plaintiff Vondrak received dividends from the LRM Bonds until May 24, 2015, albeit in increasingly smaller amounts.  The dividends were paid in the form of Bitcoins, and Plaintiff Vondrak received 23.21939 Bitcoins worth $11,100.15 (USD) based on the prevailing exchange rates at the time of the distributions.

78.     After taking into account the dividends he received from the LRM Bonds, Plaintiff Vondrak has lost the use and enjoyment of 120.27261 Bitcoins valued at $79,962.04 as of July 13, 2016.

### (iv)     Solicitation of Plaintiff Jesse Lobb

79.     On July 13, 2013, Dailey solicited Plaintiff Lobb to participate in the LRM Offering by making the following written misrepresentations of material fact via the Bitcointalk Forum:

(a)     That each LRM Bond offered to Plaintiffs constituted a right to a proportional share of the Bitcoins generated through LRM's purchase and operation of specialized Bitcoin-mining computer hardware;

(b)     That Plaintiffs would be entitled to receive weekly dividends resulting from the Bitcoin mining operations managed by LRM and Dailey based on the guaranteed minimum hash rates, and that the dividends would increase as additional LRM Bonds were sold; and

(c)     That LRM and the LRM Bonds were not regulated by any governmental entities such as the SEC or any other agency or board, and that the LRM Offering and LRM Bonds complied with all legal and regulatory requirements.

80.     In reasonable and justifiable reliance on the foregoing misrepresentations, Plaintiff Lobb purchased 1142 LRM Bonds (almost exclusively through BitFunder Exchange) between July 17, 2013 and January 27, 2014 through a series of 67 transactions.  Plaintiff Lobb purchased these LRM Bonds for 159.89421 Bitcoins.

81.     Based on the exchange rates between Bitcoins and U.S. dollars on the dates of purchase, Plaintiff Lobb invested the equivalent of $24,554.02 (USD) into LRM Bonds as a result of the foregoing misrepresentations.

82.     Between August 24, 2013 and April 4, 2014, Plaintiff Lobb sold 467.60 of his LRM Bonds for 38.5595 Bitcoins.  Based on the applicable exchange rates on the dates of sales, Lobb received the equivalent of $6,773.32 in connection with the foregoing sales of LRM Bonds.

83.     The value of Bitcoins has appreciated significantly since the dates of purchase. For example, as of July 13, 2016, the exchange rate between Bitcoins and U.S. Dollars is $664.84 per Bitcoin.  Accordingly, the dollar value of the Bitcoins that Lobb originally invested in the LRM Bonds equates to roughly $106,304.07 (USD) as of July 13, 2016.

84.     Plaintiff Lobb received dividends from the LRM Bonds until May 24, 2015, albeit in increasingly smaller amounts.  The dividends were paid in the form of Bitcoins, and Plaintiff Lobb received 15.69465056 Bitcoins worth $7,430.82 (USD) based on the prevailing exchange rates at the time of the distributions.

85.     After taking into account the partial redemptions of the LRM Bonds and the dividends he received from the LRM Bonds, Plaintiff Lobb has lost the use and enjoyment of 105.64005944 Bitcoins valued at $70,233.74 as of July 13, 2016.

**(v)      Solicitation of Plaintiff Derek Piper**

86.    Beginning on July 15, 2013, Dailey solicited Plaintiff Piper to participate in the LRM Offering by making the following written misrepresentations of material fact via the Forums:

(a)    That each LRM Bond offered to Plaintiffs constituted a right to a proportional share of the Bitcoins generated through LRM's purchase and operation of specialized Bitcoin-mining computer hardware;

(b)    That Plaintiffs would be entitled to receive weekly dividends resulting from the Bitcoin mining operations managed by LRM and Dailey based on the guaranteed minimum hash rates, and that the dividends would increase as additional LRM Bonds were sold; and

(c)    That LRM and the LRM Bonds were not regulated by any governmental entities such as the SEC or any other agency or board, and that the LRM Offering and LRM Bonds complied with all legal and regulatory requirements.

87.    In reasonable and justifiable reliance on the foregoing misrepresentations, Plaintiff Piper purchased 95 LRM Bonds (exclusively through BitFunder) between September 19, 2013 and October 19, 2013 through a series of 12 transactions. Plaintiff Piper purchased these LRM Bonds for 7.925 Bitcoins.

88.    Based on the amount of Bitcoins paid for the LRM Bonds and the currency exchange rates between Bitcoins and U.S. dollars on the dates of purchase, Piper invested the equivalent of $1,060.41 (USD) into the LRM Bonds as a result of the foregoing misrepresentations.

89.    The value of Bitcoins has appreciated significantly since the date of purchase. For example, as of July 13, 2016, the exchange rate between Bitcoins and U.S. Dollars is $664.84 per Bitcoin.  Accordingly, the dollar value of the Bitcoins that Piper originally invested in the LRM Bonds equates to roughly $5,268.86 (USD) as of July 13, 2016.

90.    Plaintiff Piper received dividends from the LRM Bonds until May 24, 2015, albeit in increasingly smaller amounts.  The dividends were paid in the form of Bitcoins, and Plaintiff Piper received 2.10138978 Bitcoins worth $919.00 (USD) based on the prevailing exchange rates at the time of the distributions.

91.    After taking into account the dividends he received from the LRM Bonds, Plaintiff Piper has lost the use and enjoyment of 5.82361022 Bitcoins valued at $3,871.77 as of July 13, 2016.

### (vi)    Solicitation of Plaintiff Christopher Galido

92.    On July 6, 2013, Dailey solicited Plaintiff Galido to participate in the LRM Offering by making the following written misrepresentations of material fact via the Forums:

(a)    That each LRM Bond offered to Plaintiffs constituted a right to a proportional share of the Bitcoins generated through LRM's purchase and operation of specialized Bitcoin-mining computer hardware;

(b)    That Plaintiffs would be entitled to receive weekly dividends resulting from the Bitcoin mining operations managed by LRM and Dailey based on the guaranteed minimum hash rates, and that the dividends would increase as additional LRM Bonds were sold; and

(c)     That LRM and the LRM Bonds were not regulated by any governmental entities such as the SEC or any other agency or board, and that the LRM Offering and LRM Bonds complied with all legal and regulatory requirements.

93.     In reasonable and justifiable reliance on the foregoing misrepresentations, Plaintiff Galido purchased 701 LRM Bonds (almost exclusively through BitFunder) between July 17, 2013 and November 23, 2013 through a series of 20 transactions.  Plaintiff Galido purchased these LRM Bonds for 98.36724 Bitcoins.

94.     Based on the amount of Bitcoins paid for the LRM Bonds and the currency exchange rates between Bitcoins and U.S. dollars on the dates of purchase, Plaintiff Galido invested the equivalent of $12,229.38 (USD) into LRM Bonds as a result of the foregoing misrepresentations.

95.     The value of Bitcoins has appreciated significantly since the dates of purchase. For example, as of July 13, 2016, the exchange rate between Bitcoins and U.S. Dollars is $664.84 per Bitcoin.  Accordingly, the dollar value of the Bitcoins that Galido originally invested in the LRM Bonds equates to roughly $65,398.48 (USD) as of July 13, 2016.

96.     Plaintiff Galido received dividends from the LRM Bonds until May 24, 2015, albeit in increasingly smaller amounts.  The dividends were paid in the form of Bitcoins, and Plaintiff Galido received 16.02946987 Bitcoins worth $7,244.75 (USD) based on the prevailing exchange rates at the time of the distributions.

97.     After taking into account the dividends he received from the LRM Bonds, Plaintiff Galido has lost the use and enjoyment of 82.33777013 Bitcoins valued at $54,741.44 as of July 13, 2016.

**(vii)     Solicitation of Plaintiff Mark Boehler**

98.     On July 6, 2013, Dailey solicited Plaintiff Boehler to participate in the LRM Offering by making the following written misrepresentations of material fact via the Butterfly Labs Forum:

(a)     That each LRM Bond offered to Plaintiffs constituted a right to a proportional share of the Bitcoins generated through LRM's purchase and operation of specialized Bitcoin-mining computer hardware;

(b)     That Plaintiffs would be entitled to receive weekly dividends resulting from the Bitcoin mining operations managed by LRM and Dailey based on the guaranteed minimum hash rates, and that the dividends would increase as additional LRM Bonds were sold; and

(c)     That LRM and the LRM Bonds were not regulated by any governmental entities such as the SEC or any other agency or board, and that the LRM Offering and LRM Bonds complied with all legal and regulatory requirements.

99.     In reasonable and justifiable reliance on the foregoing misrepresentations, Plaintiff Boehler purchased 500 LRM Bonds (exclusively through BitFunder) between July 17, 2013 and September 28, 2013 through a series of 22 transactions. Plaintiff Boehler paid 77.9473985 Bitcoins for the 500 LRM Bonds.

100.     Based on the amount of Bitcoins paid for the LRM Bonds and the currency exchange rates between Bitcoins and U.S. dollars on the dates of purchase, Plaintiff Boehler invested the equivalent of $7,825.31 (USD) into LRM Bonds as a result of the foregoing misrepresentations.

101.    The value of Bitcoins has appreciated significantly since the dates of purchase. For example, as of July 13, 2016, the exchange rate between Bitcoins and U.S. Dollars is $664.84 per Bitcoin.  Accordingly, the dollar value of the Bitcoins that Boehler originally invested in the LRM Bonds equates to roughly $51,822.55 (USD) as of July 13, 2016.

102.    Plaintiff Boehler received dividends from the LRM Bonds until May 24, 2015, albeit in increasingly smaller amounts.  The dividends were paid in the form of Bitcoins, and Plaintiff Boehler received 13.41706921 Bitcoins worth $5,427.97 (USD) based on the prevailing exchange rates at the time of the distributions.

103.    After taking into account the dividends he received from the LRM Bonds, Plaintiff Boehler has lost the use and enjoyment of 64.53032929 Bitcoins valued at $42,902.34 as of July 13, 2016.

### (viii)   Solicitation of Plaintiff Merlin Fisher-Levine

104.    On and prior to July 1, 2013, Dailey solicited Plaintiff Fisher-Levine to participate in the LRM Offering by making the following misrepresentations of material fact both verbally and in writing via email and the Butterfly Labs Forum:

(a)    That each LRM Bond offered to Plaintiffs constituted a right to a proportional share of the Bitcoins generated through LRM's purchase and operation of specialized Bitcoin-mining computer hardware;

(b)    That Plaintiffs would be entitled to receive weekly dividends resulting from the Bitcoin mining operations managed by LRM and Dailey based on the guaranteed minimum hash rates, and that the dividends would increase as additional LRM Bonds were sold; and

(c)      That LRM and the LRM Bonds were not regulated by any governmental entities such as the SEC or any other agency or board, and that the LRM Offering and LRM Bonds complied with all legal and regulatory requirements.

105.    In reasonable and justifiable reliance on the foregoing misrepresentations, Plaintiff Fisher-Levine purchased 2,970 LRM Bonds on August 12, 2013 for 297 Bitcoins. Plaintiff Fisher-Levine paid for the investment by (a) wiring $27,236.96 to Dailey, who then converted those funds to 281.8 Bitcoins on behalf of Plaintiff Fisher-Levine and in exchange for the LRM Bonds, and (b) sending Dailey an additional 15.2 Bitcoins, for a total investment of 297 Bitcoins.

106.    Based on the amount of Bitcoins paid for the LRM Bonds and the currency exchange rates between Bitcoins and U.S. dollars on the dates of purchase, Plaintiff Fisher-Levine invested the equivalent of $28,682.33 (USD) into LRM Bonds as a result of the foregoing misrepresentations.

107.    On January 27, 2014, Plaintiff Fisher-Levine sold 108 of his LRM Bonds for 7.53 Bitcoins (a U.S. dollar equivalent of $4,690.00 based on the prevailing exchange rate at the time), leaving Plaintiff Fisher-Levine with a total of 2,862 LRM Bonds.

108.    The value of Bitcoins has appreciated significantly since the dates of purchase. For example, as of July 13, 2016, the exchange rate between Bitcoins and U.S. Dollars is $664.84 per Bitcoin.  Accordingly, the dollar value of the Bitcoins that Fisher-Levine originally invested in the LRM Bonds equates to roughly $197,457.48 (USD) as of July 13, 2016.

109.    Plaintiff Fisher-Levine received dividends from the LRM Bonds until May 24, 2015, albeit in increasingly smaller amounts.  The dividends were paid in the form of Bitcoins,

and Plaintiff Fisher-Levine received 82.0793903 Bitcoins worth $31,969.12 (USD) based on the prevailing exchange rates at the time of the distributions.

110.    After taking into account the partial redemptions of the LRM Bonds and the dividends he received from the LRM Bonds, Plaintiff Fisher-Levine has lost the use and enjoyment of 207.3906097 Bitcoins valued at $137,881.57 as of July 13, 2016.

### (ix) Solicitation of Plaintiff Flachsbart

111.    On July 19, 2013, Dailey solicited Plaintiff Flachsbart to participate in the LRM Offering by making the following written misrepresentations of material fact via the Bitcointalk Forum:

(a)    That each LRM Bond offered to Plaintiffs constituted a right to a proportional share of the Bitcoins generated through LRM's purchase and operation of specialized Bitcoin-mining computer hardware;

(b)    That Plaintiffs would be entitled to receive weekly dividends resulting from the Bitcoin mining operations managed by LRM and Dailey based on the guaranteed minimum hash rates, and that the dividends would increase as additional LRM Bonds were sold; and

(c)    That LRM and the LRM Bonds were not regulated by any governmental entities such as the SEC or any other agency or board, and that the LRM Offering and LRM Bonds complied with all legal and regulatory requirements.

112.    In reasonable and justifiable reliance on the foregoing misrepresentations, Plaintiff Flachsbart purchased 114 LRM Bonds (exclusively through BitFunder) for 16.15 Bitcoins between July 17, 2013 and October 25, 2013, through a series of 25 transactions.

113.    Based on the amount of Bitcoins paid for the LRM Bonds and the currency exchange rates between Bitcoins and U.S. dollars on the dates of purchase, Plaintiff Flachsbart invested the equivalent of $1,909.94 (USD) into LRM Bonds as a result of the foregoing misrepresentations.

114.    The value of Bitcoins has appreciated significantly since the dates of purchase. For example, as of July 13, 2016, the exchange rate between Bitcoins and U.S. Dollars is $664.84 per Bitcoin.  Accordingly, the dollar value of the Bitcoins that Flachsbart originally invested in the LRM Bonds equates to roughly $10,737.17 (USD) as of July 13, 2016.

115.    Plaintiff Flachsbart received dividends from the LRM Bonds until May 24, 2015, albeit in increasingly smaller amounts.  The dividends were paid in the form of Bitcoins, and Plaintiff Flachsbart received 2.12415385 Bitcoins worth $1,274.45 (USD) based on the prevailing exchange rates at the time of the distributions.

116.    After taking into account the dividends he received from the LRM Bonds, Plaintiff Flachsbart has lost the use and enjoyment of 14.02584615 Bitcoins valued at $9,324.94 as of July 13, 2016.

**(x)    Solicitation of Plaintiff Russ Henderson**

117.    On July 22, 2013, Dailey solicited Plaintiff Henderson to participate in the LRM Offering by making the following misrepresentations of material fact via the Bitcointalk Forum:

(a)    That each LRM Bond offered to Plaintiffs constituted a right to a proportional share of the Bitcoins generated through LRM's purchase and operation of specialized Bitcoin-mining computer hardware;

(b)    That Plaintiffs would be entitled to receive weekly dividends resulting from the Bitcoin mining operations managed by LRM and Dailey based on the guaranteed

minimum hash rates, and that the dividends would increase as additional LRM Bonds were sold; and

(c)     That LRM and the LRM Bonds were not regulated by any governmental entities such as the SEC or any other agency or board, and that the LRM Offering and LRM Bonds complied with all legal and regulatory requirements.

118.    In reasonable and justifiable reliance on the foregoing misrepresentations, Plaintiff Henderson purchased 29 LRM Bonds on July 17, 2013 with 4.64 Bitcoins, traded high-end mining computer hardware for 1,062.81 Bitcoins that were used to purchase 5,061 LRM Bonds on September 7, 2013, and traded more high-end mining computer hardware for 260 Bitcoins that were used to purchase an additional 2,000 LRM Bonds on October 3, 2013.  Thus, in total, Plaintiff Henderson purchased 7,090 LRM Bonds for 1,327.45 Bitcoins.

119.    Based on the exchange rates between Bitcoins and U.S. dollars on the dates of purchase, Plaintiff Henderson invested the equivalent of $157,325.02 (USD) into LRM Bonds as a result of the foregoing misrepresentations.

120.    Plaintiff Henderson later sold 2,663 LRM Bonds for 361.342 Bitcoins.  Based on the exchange rates between Bitcoins and U.S. dollars on the dates of those sales, he realized the equivalent of $45,764.59 (USD).

121.    Accordingly, Plaintiff Henderson's net investment in LRM Bonds (his investment minus his recovery in connection with the sale of certain LRM Bonds) amounted to 966.108 Bitcoins for 4,427 LRM Bonds.  Based on the exchange rates between Bitcoins and U.S. dollars on the pertinent dates, Henderson's net investment of 966.108 Bitcoins amounted to $111,560.43.

122.   The value of Bitcoins has appreciated significantly since the dates of purchase. For example, as of July 13, 2016, the exchange rate between Bitcoins and U.S. Dollars is $664.84 per Bitcoin.  Accordingly, the dollar value of the Bitcoins representing Henderson's net investment in the LRM Bonds equates to roughly $642,307.24 (USD) as of July 13, 2016.

123.   Plaintiff Henderson received dividends from the LRM Bonds until May 24, 2015, albeit in increasingly smaller amounts.  The dividends were paid in the form of Bitcoins, and Plaintiff Henderson received 106.3266081 Bitcoins worth $46,202.92 (USD) based on the prevailing exchange rates at the time of the distributions.

124.   After taking into account the partial redemptions of the LRM Bonds and the dividends he received from the LRM Bonds, Plaintiff Henderson has lost the use and enjoyment of 859.7813919 Bitcoins valued at $571,617.06 as of July 13, 2016.

### D.   Summary of Plaintiffs' Investments in the LRM Bonds

125.   Diversity jurisdiction exists as long as at least one plaintiff has satisfied the amount-in-controversy requirement.  *Exxon Mobil Corp. v. Allapattah Svcs., Inc.*, 545 U.S. 546, 559 (2005).  As set forth in the table below, half of the individual Plaintiffs—even after taking into account prior re-sales of LRM Bonds and dividends received—satisfy the jurisdictional threshold in excess of $75,000 based upon the current value of the Bitcoins that they exchanged to acquire the LRM Bonds from Dailey and LRM.

| Investor Name | Original Investment in LRM Bonds (in Bitcoins) | Sales of LRM Bonds (in Bitcoins) | Dividends from LRM Bonds (in Bitcoins) | Net Bitcoin Investment in LRM Bonds | Value of Bitcoins as of 7/13/2016 (in USD)[16] |
|---|---|---|---|---|---|
| Brandon | 260.97 | N/A | 46.78218949 | 214.18781051 | $142,400.62 |

_____

[16] To arrive at the total net value in U.S. Dollars, the net number of Bitcoin invested by each Plaintiff (Column 5) is multiplied by the exchange rate ($664.84 as of July 13, 2016).

| Investor Name | Original Investment in LRM Bonds (in Bitcoins) | Sales of LRM Bonds (in Bitcoins) | Dividends from LRM Bonds (in Bitcoins) | Net Bitcoin Investment in LRM Bonds | Value of Bitcoins as of 7/13/2016 (in USD)[16] |
|---|---|---|---|---|---|
| Gordon | | | | | |
| Curtis Green | 337 | 19.5 | 26.65148443 | 290.84851557 | $193,367.73 |
| Jakub Vondrak | 143.492 | N/A | 23.21939 | 120.27261 | $79,962.04 |
| Jesse Lobb | 159.89421 | 38.5595 | 15.69465056 | 105.64005944 | $70,233.74 |
| Derek Piper | 7.925 | N/A | 2.10138978 | 5.82361022 | $3,871.77 |
| Christopher Galido | 98.36724 | N/A | 15.69465056 | 82.33777013 | $54,741.44 |
| Mark Boehler | 77.9473985 | N/A | 13.41706921 | 64.53032929 | $42,902.34 |
| Merlin Fisher-Levine | 297 | 7.53 | 82.0793903 | 207.3906097 | $137,881.57 |
| Nathanael Flachsbart | 16.15 | N/A | 2.12415385 | 14.02584615 | $9,324.94 |
| Russ Henderson | 1,327.45 | 361.342 | 106.3266081 | 859.7813919 | $571,617.06 |

## E.      General Omissions of Material Facts by Dailey

126.    In addition to the foregoing express misrepresentations, at the time Dailey solicited each of the Plaintiffs to purchase LRM Bonds, Dailey knew or reasonably should have known that the following material facts had been omitted from his communications with Plaintiffs:

(a)      That LRM had failed to either register the LRM Bonds or seek any applicable exemptions;

(b)      That LRM's sale and delivery of the unregistered LRM Bonds constituted a violation of federal securities law;

(c)      That he failed to identify the material risks related to LRM's operation and ability to make dividend payments, and failed to disclose cash flow information required by applicable securities laws;

(d)      That the LRM Bonds sold to Plaintiffs were worthless and unmarketable; and

(e)     That the Bitcoin and other monies tendered by Plaintiffs in connection with the LRM Offering would be diverted to other, improper purposes such as payment of a substantial salary for Dailey and the purchase of mining equipment for non-Bitcoin virtual currency, neither of which had been agreed to by Plaintiffs and the other investors and neither of which had been disclosed in connection with the LRM Offering.

127.    Plaintiffs, individually and collectively, reasonably relied on the foregoing misrepresentations and omissions. Plaintiffs would not have purchased the LRM Bonds or entered into any relationship with LRM had they known of the falsity of the foregoing misrepresentations and omissions.

128.    Dailey and LRM, directly or indirectly, have made use of the means or instruments of transportation or communication in interstate commerce, or the mails, to offer and sell securities when no registration statement was filed or in effect as to such securities and when no exemption from registration was applicable.

129.    As a direct and proximate result of the foregoing wrongful conduct, Plaintiffs have incurred, and will continue to incur, substantial damages, including but not limited to compensatory damages, lost interest and dividends, attorneys' fees, and the costs of litigation.

130.    Plaintiffs have repeatedly demanded that Dailey rescind the unlawful transactions at issue and return the Bitcoins that Dailey fraudulently obtained and retained, but Dailey has refused to do so.

131.    Plaintiffs have retained the law firm of McDonald Hopkins LLC, and previously retained the law firm of Akerman, LLP, to represent them in this matter and are obligated to pay (or have paid) reasonable attorneys' fees to those firms.

132.    All conditions precedent to this action have occurred or have been performed or waived.

## COUNT I – SECTION 12(a)(1) OF SECURITIES ACT OF 1933
## (FOR VIOLATIONS OF 15 U.S.C. § 77e)
### (By All Plaintiffs)

133.    Plaintiffs re-allege and incorporate Paragraphs 1 through 132 as if fully set forth herein.

134.    This is an action under Section 12(a)(1) of the Securities Act of 1933, codified at 15 U.S.C. § 77*l*(a)(1), to recover damages incurred as a result of violations of 15 U.S.C. § 77e.

135.    Section 12(a)(1) imposes liability on any person who "offers or sells a security in violation of Section 77e of [Title 15]." Section 77e, in turn, provides that "unless a registration statement is in effect as to a security," it is unlawful

(a)     to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or

(b)     to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

136.    The LRM Bonds constitute "securities" within the meaning of the foregoing prohibition because they constitute "investment contracts." 15 U.S.C. § 77b.

137.    Dailey solicited investments from Plaintiffs, who each live in other states, by publishing communications (including but not limited to the LRM Official Announcement, the Summary, and the LRM Business Plan) on the Internet for that purpose. In doing so, Dailey

made use of means of communication in interstate commerce to sell the LRM Bonds, and he offered and sold securities to the public.

138.   Dailey violated Section 77e and therefore is liable under Section 12(a)(1) because he offered and sold the LRM Bonds without the required registration statement.

139.   As a result of Dailey's violation of the foregoing statute, he is liable to repay the consideration paid for the LRM Bonds with interest thereon, less the amount of any income received thereon, upon the tender of the LRM Bonds.

140.   All purchases of LRM Bonds were made in the form of Bitcoins, and Plaintiffs seek the return of the Bitcoins that they invested because the Bitcoins formed the consideration paid. In the alternative, Plaintiffs seek the return of their investments in the form of U.S. dollars at the prevailing Bitcoin/U.S. dollar exchange rate.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter a judgment against Dailey for statutory rescissionary damages, incidental and consequential damages, pre- and post-judgment interest, and costs of litigation, and any other relief that the Court deems appropriate and just.

## COUNT II – CONTROL-PERSON LIABILITY UNDER SECURITIES ACT OF 1933 FOR VIOLATIONS OF SECTION 12(a)(1)
### (15 U.S.C. § 77*o*(a))
**(By All Plaintiffs)**

141.   Plaintiffs re-allege and incorporate Paragraphs 1 through 140 as if fully set forth herein.

142.   To the extent that the acts and omissions complained of in Count I are found to be acts and omissions of LRM, then Plaintiffs assert this action in the alternative, and pursuant to Section 15(a) of the Securities Act of 1933, codified at 15 U.S.C. § 77*o*(a), to recover damages against Dailey on the basis of control-person liability.

143.    Upon information and belief, Dailey was at all relevant times the sole owner of LRM and exercised plenary authority over LRM's activities and operations.

144.    As the control person of LRM, Dailey is liable to the same extent that LRM would be liable for the foregoing violations of Section 12(a)(1) of the Securities Act of 1933.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter a judgment against Dailey for statutory rescissionary damages, incidental and consequential damages, pre- and post-judgment interest, and costs of litigation, and any other relief that the Court deems appropriate and just.

## COUNT III – VIOLATIONS OF SECTION 12(a)(2) OF SECURITIES ACT OF 1933
### (15 U.S.C. § 77*l*(a)(2))
### (By All Plaintiffs)

145.    Plaintiffs re-allege and incorporate Paragraphs 1 through 132 as if fully set forth herein, except for any allegations that sound in fraud.

146.    This is an action under Section 12(a)(2) of the Securities Act of 1933, codified at 15 U.S.C. § 77*l*(a)(2), to recover damages incurred as a result of negligent misrepresentations and omissions made in connection with the sale of LRM Bonds to Plaintiffs.

147.    Dailey offered and sold the LRM Bonds to Plaintiffs through interstate commerce by means of a "prospectus" that was not compliant with applicable legal requirements but that nonetheless constitutes a "prospectus" within the statutory definition. 15 U.S.C. §77b(a)(10). Specifically, the LRM Official Statement, the Summary, and the LRM Business Plan each constitutes a "prospectus" within the statutory definition because a prospectus includes any advertisement or communication "which offers any security for sale or confirms the sale of any security" and because the aforementioned documents fall within none of the statutory exceptions to the definition.

148.    Dailey has violated Section 12(a)(2) of the Securities Act because each of the aforementioned documents that constitutes a "prospectus" contained untrue statements of material fact or omitted material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading, and because Plaintiffs did not know of such misrepresentations or omissions. Had Dailey exercised reasonable care, he would have known of or discovered the material misrepresentations and/or omissions.

149.    As a result of Dailey's violation of the foregoing statute, he is liable to repay the consideration paid for the LRM Bonds with interest thereon, less the amount of any income received thereon, upon the tender of the LRM Bonds.

150.    All purchases of LRM Bonds were made in the form of Bitcoins, and Plaintiffs seek the return of the Bitcoins that they invested because the Bitcoins formed the consideration paid. In the alternative, Plaintiffs seek the return of their investments in the form of U.S. dollars at the prevailing Bitcoin/U.S. dollar exchange rate.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter a judgment against Dailey for statutory rescissionary damages, incidental and consequential damages, pre- and post-judgment interest, and costs of litigation, and any other relief that the Court deems appropriate and just.

## COUNT IV – CONTROL-PERSON LIABILITY UNDER SECURITIES ACT OF 1933 FOR VIOLATIONS OF SECTION 12(a)(2) (15 U.S.C. § 77*o*(a)) (By All Plaintiffs)

151.    Plaintiffs re-allege and incorporate Paragraphs 1 through 132 and 146 through 150 as if fully set forth herein.

152.    To the extent that the acts and omissions complained of in Count II are found to be acts and omissions of LRM, then Plaintiffs assert this action in the alternative, and pursuant to

Section 15(a) of the Securities Act of 1933, codified at 15 U.S.C. § 77*o*(a), to recover damages against Dailey on the basis of control-person liability.

153.    Upon information and belief, Dailey was at all relevant times the sole owner of LRM and exercised plenary authority over LRM's activities and operations.

154.    As the control person of LRM, Dailey is liable to the same extent that LRM would be liable for the foregoing violations of Section 12(a)(2) of the Securities Act of 1933.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter a judgment against Dailey for statutory rescissionary damages, incidental and consequential damages, pre- and post-judgment interest, and costs of litigation, and any other relief that the Court deems appropriate and just.

## COUNT V– VIOLATIONS OF 17 C.F.R § 240.10b-5
### (By All Plaintiffs)

155.    Plaintiffs re-allege and incorporate Paragraphs 1 through 132 as if fully set forth herein.

156.    This is an action to recover damages incurred as result of Dailey's violations of Section 10(b) of the Exchange Act of 1934 and 17 C.F.R. § 240.10b-5 promulgated thereunder.

157.    Dailey acted with intent to deceive, manipulate, and defraud Plaintiffs, and acted with severe recklessness, at the time of the foregoing misrepresentations and omissions. Dailey knew or should have known of the falsity of the foregoing misrepresentations and omissions because, among other things, (a) the LRM Bonds unquestionably were subject to federal and state securities laws but Dailey misrepresented that they were not; (b) Dailey was violating state and federal laws in connection with the offer and sale of LRM Bonds to Plaintiffs and other investors; and (c) Dailey had no present intention at the time of the LRM Offering and

solicitation to return the Bitcoins that Plaintiffs transferred to Dailey in order to fund the purchase of LRM Bonds.

158.    Dailey made numerous untrue statements of material fact to Plaintiffs concerning the LRM Offering and LRM Bonds as specified herein.

159.    Dailey was aware of and omitted numerous material facts concerning the LRM Offering and LRM Bonds as specified herein.

160.    The foregoing misrepresentations and omissions constitute acts, practices, or a course of business that operated as a fraud and deceit upon Plaintiffs.

161.    Dailey used means or instrumentalities of interstate commerce, including the mail, email, and the Internet, in connection with misrepresentations and omissions, and to directly or indirectly employ a device, scheme, or artifice to convince Plaintiffs to purchase LRM Bonds.

162.    Dailey obtained Bitcoins, money, and other property from Plaintiffs as a result of Dailey's misrepresentations and omissions.

163.    Dailey acted with intent to deceive, manipulate and defraud Plaintiffs, and with severe recklessness, at the time that Dailey made the foregoing misrepresentations and omissions.

164.    The foregoing misrepresentations and omissions constituted securities fraud in violation of 17 C.F.R § 240.10b-5.

165.    Plaintiffs have suffered damages as a direct and proximate cause of Dailey's violations of 17 C.F.R § 240.10b-5.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter a judgment against Dailey for compensatory damages, incidental and consequential damages, pre- and post-

judgment interest, costs of litigation, and any other relief that the Court deems appropriate and just.

## COUNT VI – CONTROL-PERSON LIABILITY UNDER SECURITIES EXCHANGE ACT OF 1934 FOR VIOLATIONS OF 17 C.F.R § 240.10b-5 (15 U.S.C. § 78(t)) (By All Plaintiffs)

166.    Plaintiffs re-allege and incorporate Paragraphs 1 through 132 and 156 through 165 as if fully set forth herein.

167.    To the extent that the acts and omissions complained of in Count V are found to be acts and omissions of LRM, then Plaintiffs assert this action in the alternative, and pursuant to Section 20(a) of the Securities Exchange Act of 1934, codified at 15 U.S.C. § 78(t), to recover damages against Dailey on the basis of control-person liability.

168.    Upon information and belief, Dailey was at all relevant times the sole owner of LRM and exercised plenary authority over LRM's activities and operations.

169.    As the control person of LRM, Dailey is liable to the same extent that LRM would be liable for the foregoing violations of Section 10(b) of the Securities Exchange Act of 1934 and of 17 C.F.R § 240.10b-5.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter a judgment against Dailey for statutory rescissionary damages, incidental and consequential damages, pre- and post-judgment interest, and costs of litigation, and any other relief that the Court deems appropriate and just.

## COUNT VII – VIOLATIONS OF NEW JERSEY UNIFORM SECURITIES LAW FOR SALE OF UNREGISTERED SECURITIES (By All Plaintiffs)

170.    Plaintiffs re-allege and incorporate Paragraphs 1 through 132 as if fully set forth herein.

171.    This is an action under the New Jersey Uniform Securities Law ("New Jersey Act"), N.J. Stat. Ann. §§ 49:3-60 and 49:3-71 (1997), to recover the consideration paid for the LRM Bonds, which exceeds $75,000 as to certain Plaintiffs, on the basis of Dailey's violation of Section 49:3-60. This Court has original jurisdiction over the claims of those Plaintiffs whose individual statutory remedies exceed $75,000, and pendent subject-matter jurisdiction over the claims of the remaining Plaintiffs.

172.    Section 49:3-60 of the New Jersey Act prohibits the offer or sale of securities in New Jersey unless the security or transaction is exempt under Section 49:3-50, or the security is registered pursuant to the New Jersey Uniform Securities Law, or the security is "a federal covered security for which a notice filing and fees have been submitted as required by section 14 . . ."

173.    The LRM Bonds that Plaintiffs purchased from Dailey constitute investment contracts and therefore constitute securities under Section § 49:3-49(m) of the New Jersey Act, because "investment contracts" have the same definition under New Jersey law as under the federal securities laws.

174.    Dailey sold unregistered, non-exempt securities to Plaintiffs in violation of Section 49:3-60 of the New Jersey Act.

175.    Pursuant to Section 49:3-71(a)(1) and (c) of the New Jersey Act, Dailey's violations entitle Plaintiffs to recover the consideration paid for the LRM Bonds.

176.    The consideration paid to Dailey for the LRM Bonds was in the form of Bitcoins, and Plaintiffs are entitled to recover the Bitcoins or their equivalent value, minus the income received on the LRM Bonds. Based on the current value of the Bitcoins, the Plaintiffs have

incurred losses in the following amounts after accounting for the income received on the LRM Bonds[17] (in the form of Bitcoin-denominated dividends, as all dividends were paid in Bitcoins):

(a)     Plaintiff Gordon − $142,400.62 (investment of 260.97 Bitcoins minus 46.78218949 Bitcoins received as dividends = 214.18781051 Bitcoins, multiplied at July 13, 2016 exchange rate).

(b)     Plaintiff Green − $193,367.73 (investment of 337 Bitcoins minus 19.5 Bitcoins received from sale of certain LRM Bonds and 26.65148443 Bitcoins received as dividends = 290.84851557 Bitcoins, multiplied at July 13, 2016 exchange rate);

(c)     Plaintiff Vondrak − $79,962.04 (investment of 143.492 Bitcoins minus 23.21939 Bitcoins received as dividends = 120.27261 Bitcoins, multiplied at July 13, 2016 exchange rate).

(d)     Plaintiff Lobb − $70,233.74 (investment of 159.89421 Bitcoins minus 38.5595 Bitcoins received from sale of certain LRM Bonds and 15.69465056 Bitcoins received as dividends = 105.64005944 Bitcoins, multiplied at July 13, 2016 exchange rate).

(e)     Plaintiff Piper − $3,871.77 (investment of 7.925 Bitcoins minus 2.10138978 Bitcoins received as dividends = 5.82361022 Bitcoins, multiplied at July 13, 2016 exchange rate);

---

[17] The losses identified herein are actually understated because the New Jersey Act authorizes recovery of the consideration paid for the security plus "interest set at the rate established for interest on judgments for the same period by the Rules Governing the Courts of the State of New Jersey from the date of payment of the consideration" plus costs, before subtracting the amount of any income received on the security. §§ 49:3-71(c). The calculations herein do not even account for the statutory interest rate and costs, and therefore the recovery to which Plaintiffs are entitled is actually higher than indicated in these allegations.

(f)     Plaintiff Galido – $54,741.44 (investment of 98.36724 Bitcoins minus 15.69465056 Bitcoins received as dividends = 82.33777013 Bitcoins, multiplied at July 13, 2016 exchange rate);

(g)     Plaintiff Boehler – $42,902.34 (investment of 77.9473985 Bitcoins minus 13.41706921 Bitcoins received as dividends = 64.53032929 Bitcoins, multiplied at July 13, 2016 exchange rate);

(h)     Plaintiff Fisher-Levine – $137,881.57 (investment of 297 Bitcoins minus 7.53 Bitcoins received from sale of certain LRM Bonds and 82.0793903 Bitcoins received as dividends = 207.3906097 Bitcoins, multiplied at July 13, 2016 exchange rate);

(i)     Plaintiff Flachsbart – $9,324.94 (investment of 16.15 Bitcoins minus 2.12415385 Bitcoins received as dividends = 14.02584615 Bitcoins, multiplied at July 13, 2016 exchange rate); and

(j)     Plaintiff Henderson – $571,617.06 (investment of 1,327.45 Bitcoins minus 361.342 Bitcoins received from sale of certain LRM Bonds and 106.3266081 Bitcoins received as dividends = 859.7813919 Bitcoins, multiplied at July 13, 2016 exchange rate).

**WHEREFORE**, Plaintiffs respectfully request that the Court enter a judgment against Dailey for their losses recoverable under the New Jersey Act, pre- and post-judgment interest, costs of litigation, and any other relief that the Court deems appropriate and just.

### COUNT VIII – VIOLATIONS OF NEW JERSEY UNIFORM SECURITIES LAW FOR MISREPRESENTATIONS IN CONNECTION WITH SALE OF LRM BONDS
**(By All Plaintiffs)**

177.    Plaintiffs re-allege and incorporate Paragraphs 1 through 132 as if fully set forth herein.

178.    This is an action under the New Jersey Uniform Securities Law ("New Jersey Act"), N.J. Stat. Ann. § 49:3-71(a)(2)–(4) (1997), to recover the consideration paid for the LRM Bonds, which exceeds $75,000 as to certain Plaintiffs, on the basis of Dailey's material misrepresentations and omissions in connection with the sale of the LRM Bonds. This Court has original jurisdiction over the claims of those Plaintiffs whose individual statutory remedies exceed $75,000, and pendent subject-matter jurisdiction over the claims of the remaining Plaintiffs.

179.    The LRM Bonds that Plaintiffs purchased from Dailey constitute investment contracts and therefore constitute securities under the New Jersey Uniform Securities Law (the "New Jersey Act"), N.J. Stat. Ann. §49:3-49(m), because "investment contracts" have the same definition under New Jersey law as under the federal securities laws.

180.    In connection with the LRM Offering and sale of LRM Bonds to Plaintiffs, Dailey

(a)     Employed a device, scheme, or artifice to defraud Plaintiffs, as evidenced by the misrepresentations and omissions alleged herein;

(b)     Made untrue statements of material fact and omitted material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; and

(c)     Engaged in a transaction, practice, or course of business that operated as a fraud or deceit on Plaintiffs.

181.    Dailey made the misrepresentations and omissions to Plaintiffs with intent to deceive, manipulate, and defraud Plaintiffs, and/or with severe recklessness and reckless disregard for the truth of the representations.

182.    Dailey knew or reasonably should have known that Plaintiffs would justifiably and reasonably rely on the misrepresentations and omissions.

183.    Plaintiffs justifiably and reasonably relied on the misrepresentations and omissions in connection with their purchase of LRM Bonds. Plaintiffs did not know of the misrepresentations or omissions at the time they purchased the LRM Bonds.

184.    Pursuant to Section 49:3-71(a)(2)–(4) and (c) of the New Jersey Act, Dailey's misconduct entitles Plaintiffs to recover the consideration paid for the LRM Bonds.

185.    The consideration paid to Dailey for the LRM Bonds was in the form of Bitcoins, and Plaintiffs are entitled to recover the Bitcoins or their equivalent value, minus the income received on the LRM Bonds. Based on the current value of the Bitcoins, the Plaintiffs have incurred losses in the following amounts after accounting for the income received on the LRM Bonds[18] (in the form of Bitcoin-denominated dividends, as all dividends were paid in Bitcoins):

(a)    Plaintiff Gordon – $142,400.62 (investment of 260.97 Bitcoins minus 46.78218949 Bitcoins received as dividends = 214.18781051 Bitcoins, multiplied at July 13, 2016 exchange rate).

(b)    Plaintiff Green – $193,367.73 (investment of 337 Bitcoins minus 19.5 Bitcoins received from sale of certain LRM Bonds and 26.65148443 Bitcoins received as dividends = 290.84851557 Bitcoins, multiplied at July 13, 2016 exchange rate);

(c)    Plaintiff Vondrak – $79,962.04 (investment of 143.492 Bitcoins minus 23.21939 Bitcoins received as dividends = 120.27261 Bitcoins, multiplied at July 13, 2016 exchange rate).

---

[18] As explained in the preceding footnote, these calculations understate Plaintiff's recoverable losses.

(d)      Plaintiff Lobb – $70,233.74 (investment of 159.89421 Bitcoins minus 38.5595 Bitcoins received from sale of certain LRM Bonds and 15.69465056 Bitcoins received as dividends = 105.64005944 Bitcoins, multiplied at July 13, 2016 exchange rate).

(e)      Plaintiff Piper – $3,871.77 (investment of 7.925 Bitcoins minus 2.10138978 Bitcoins received as dividends = 5.82361022 Bitcoins, multiplied at July 13, 2016 exchange rate);

(f)      Plaintiff Galido – $54,741.44 (investment of 98.36724 Bitcoins minus 15.69465056 Bitcoins received as dividends = 82.33777013 Bitcoins, multiplied at July 13, 2016 exchange rate);

(g)      Plaintiff Boehler – $42,902.34 (investment of 77.9473985 Bitcoins minus 13.41706921 Bitcoins received as dividends = 64.53032929 Bitcoins, multiplied at July 13, 2016 exchange rate);

(h)      Plaintiff Fisher-Levine – $137,881.57 (investment of 297 Bitcoins minus 7.53 Bitcoins received from sale of certain LRM Bonds and 82.0793903 Bitcoins received as dividends = 207.3906097 Bitcoins, multiplied at July 13, 2016 exchange rate);

(i)      Plaintiff Flachsbart – $9,324.94 (investment of 16.15 Bitcoins minus 2.12415385 Bitcoins received as dividends = 14.02584615 Bitcoins, multiplied at July 13, 2016 exchange rate); and

(j)      Plaintiff Henderson – $571,617.06 (investment of 1,327.45 Bitcoins minus 361.342 Bitcoins received from sale of certain LRM Bonds and 106.3266081 Bitcoins received as dividends = 859.7813919 Bitcoins, multiplied at July 13, 2016 exchange rate).

**WHEREFORE**, Plaintiffs respectfully request that the Court enter a judgment against Dailey for their losses recoverable under the New Jersey Act, pre- and post-judgment interest, costs of litigation, and any other relief that the Court deems appropriate and just.

## COUNT IX – VIOLATION OF THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT
### (By Plaintiff Gordon)

186.　Plaintiff Gordon re-alleges and incorporates Paragraphs 1 through 132 as if fully set forth herein.

187.　This is an action for rescission by Plaintiff Gordon under the Florida Securities and Investor Protection Act (the "Florida Act") on the basis of Dailey's sale of unregistered, non-exempt securities in violation of Section 517.07, Florida Statutes. This action seeks recovery in excess of $75,000.

188.　The LRM Bonds that Plaintiff Gordon purchased from Dailey constitute an "investment" under Fla. Stat. § 517.301(2). The LRM Bonds also constitute an "investment contract" under Section 517.021(22)(q), a beneficial interest in title to property, profits, or earnings under Section 517.021(22)(r), and/or an interest in or under a profit-sharing or participation agreement or scheme under Section 517.021(22)(s), and therefore constitute a "security" within the meaning of the Florida Act.

189.　Section 517.07 prohibits the sale of securities in Florida unless the security or the transaction in which it is sold is exempt under the Florida Act, unless the security is a federal covered security, or unless the security is registered pursuant to the Florida Act.

190.　Dailey violated Section 517.07 by soliciting Gordon in Florida and selling the LRM Bonds to Gordon in Florida because the LRM Bonds were not registered or exempt, and even though the security is not a federal covered security.

191.    As a result of Dailey's violation of the foregoing statute, Gordon is entitled to rescission under Section 517.211(2) of the Florida Act. Specifically, Gordon is entitled to recover the consideration paid for the LRM Bonds, plus interest thereon at the legal rate, less the amount of dividends received on the LRM Bonds.

192.    The consideration paid to Dailey for the LRM Bonds was in the form of Bitcoins, and Gordon is entitled to recover the Bitcoins or their equivalent value, minus the dividends received on the LRM Bonds. Based on the current value of the Bitcoins, Gordon has incurred losses in the amount of $142,400.62. This amount is calculated as his investment of 260.97 Bitcoins minus 46.78218949 Bitcoins received as dividends, multiplied at the July 13, 2016 exchange rate.[19]

**WHEREFORE**, Plaintiff Brandon Gordon respectfully requests that the Court enter a judgment against Dailey for rescission of his purchase of the LRM Bonds and recovery of all amounts recoverable under the statute, including pre- and post-judgment interest, attorneys' fees and costs of litigation, and any other relief that the Court deems appropriate and just.

## COUNT X – VIOLATION OF THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT
### (By Plaintiff Gordon)

193.    Plaintiff Gordon re-alleges and incorporates Paragraphs 1 through 132 as if fully set forth herein.

194.    This is an action for rescission by Plaintiff Gordon under the Florida Securities and Investor Protection Act (the "Florida Act") on the basis of Dailey's material

---

[19] The losses identified herein are actually understated because the Florida Act authorizes recovery of the consideration paid for the security plus interest thereon at the legal rate before subtracting the amount of any income received on the security. Fla. Stat. § 517.211(3)(a). The calculations herein do not account for the statutory interest rate, and therefore the recovery to which Gordon is entitled is actually higher than indicated in these allegations.

misrepresentations and omissions in violation of Section 517.301(1) of the Florida Act. This action seeks recovery in excess of $75,000.

195.    The LRM Bonds that Plaintiff Gordon purchased from Dailey constitute an "investment" under Fla. Stat. § 517.301(2). The LRM Bonds also constitute an "investment contract" under Section 517.021(22)(q), a beneficial interest in title to property, profits, or earnings under Section 517.021(22)(r), and/or an interest in or under a profit-sharing or participation agreement or scheme under Section 517.021(22)(s), and therefore constitute a "security" within the meaning of the Florida Act.

196.    In connection with the LRM Offering and the sale of the LRM Bonds to Plaintiff Gordon, Dailey:

        (a)    employed a device, scheme, or artifice to defraud Gordon as evidenced by the misrepresentations and omissions alleged herein;

        (b)    obtained property from Gordon in the form of Bitcoins and equipment by means of untrue statements of material fact and omissions of material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading;

        (c)    engaged in a transaction, practice, or course of business that operated as a fraud or deceit on Gordon; and

197.    Dailey made the misrepresentations and omissions to Plaintiff Gordon with intent to deceive, manipulate, and defraud him, and/or with severe recklessness and reckless disregard for the truth of the representations.

198.    Dailey knew or reasonably should have known that Plaintiff Gordon would justifiably and reasonably rely on the misrepresentations and omissions.

199.     Plaintiff Gordon justifiably and reasonably relied on the misrepresentations and omissions in connection with his purchase of LRM Bonds.

200.     Dailey violated the Florida Act by causing Plaintiff Gordon to invest in the LRM Offering and purchase LRM bonds in reliance upon the misrepresentations and omissions.

201.     As a result of Dailey's violation of the foregoing statute, Gordon is entitled to rescission under Section 517.211(2) of the Florida Act. Specifically, Gordon is entitled to recover the consideration paid for the LRM Bonds, plus interest thereon at the legal rate, less the amount of dividends received on the LRM Bonds.

202.     The consideration paid to Dailey for the LRM Bonds was in the form of Bitcoins, and Gordon is entitled to recover the Bitcoins or their equivalent value, minus the dividends received on the LRM Bonds. Based on the current value of the Bitcoins, Gordon has incurred losses in the amount of $142,400.62. This amount is calculated as his investment of 260.97 Bitcoins minus 46.78218949 Bitcoins received as dividends, multiplied at the July 13, 2016 exchange rate.[20]

**WHEREFORE**, Plaintiff Brandon Gordon respectfully requests that the Court enter a judgment against Dailey for rescission of his purchase of the LRM Bonds and recovery of all amounts recoverable under the statute, including pre- and post-judgment interest, attorneys' fees and costs of litigation, and any other relief that the Court deems appropriate and just.

## COUNT XI – COMMON LAW FRAUD
### (By All Plaintiffs)

203.     Plaintiffs re-allege and incorporate Paragraphs 1 through 132 as if fully set forth herein.

---

[20] As explained in the preceding footnote, the losses alleged herein are understated.

204.     This is an action for common-law fraud. This Court has original jurisdiction over the claims of those Plaintiffs whose individual damages or losses exceed $75,000, and pendent subject matter jurisdiction over the claims of the remaining Plaintiffs.

205.     In connection with the LRM Offering, Dailey misrepresented and omitted material facts concerning the LRM Offering and LRM Bonds to Plaintiffs, as alleged herein.

206.     Dailey knew that the misrepresentations were false at time such misrepresentations were communicated to Plaintiffs, and knew that he was omitting material facts during his communications with Plaintiffs.

207.     Dailey made the misrepresentations and omissions to Plaintiffs with intent to deceive, manipulate, and defraud Plaintiffs, and/or with severe recklessness and reckless disregard for the truth of the representations.

208.     Dailey intended for Plaintiffs to rely upon the misrepresentations and omissions in order to induce Plaintiffs to invest in and purchase the LRM Bonds.

209.     Plaintiffs reasonably and justifiably relied upon the misrepresentations and omissions by investing in and purchasing the LRM Bonds.

210.     Plaintiffs were induced into purchasing the LRM Bonds as a result of the misrepresentations and omissions alleged herein, and Plaintiffs would not have purchased the LRM Bonds had Dailey not made the misrepresentations and omissions.

211.     Plaintiffs have suffered damages as a direct and proximate result of Dailey's fraud.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter a judgment against Dailey for rescission, compensatory damages, incidental and consequential damages, punitive

and exemplary damages, pre- and post-judgment interest, attorneys; fees and costs of litigation, and any other relief that the Court deems appropriate and just.

## COUNT XII – NEGLIGENT MISREPRESENTATION
### (By All Plaintiffs)

212.    Plaintiffs re-allege and incorporate Paragraphs 1 through 132 as if fully set forth herein.

213.    This is an action for negligent misrepresentation. This Court has original jurisdiction over the claims of those Plaintiffs whose individual damages or losses exceed $75,000, and pendent subject matter jurisdiction over the claims of the remaining Plaintiffs.

214.    In connection with the LRM Offering, Dailey misrepresented and omitted material facts concerning the LRM Offering and LRM Bonds to Plaintiffs, as specified herein. Dailey knew, or reasonably should have known, that the misrepresentations and omission were false at the time he communicated them to Plaintiffs.

215.    Additionally, sometime prior to March 8, 2014, Dailey received legal advice from his counsel that he could face criminal charges in connection with the LRM Offering if he did not change the terms of the agreements with Plaintiffs and the other investors. Dailey knew or reasonably should have known of the legal deficiencies of the LRM Offering at the time of the LRM Offering, but failed to disclose them.

216.    Dailey intended for Plaintiffs to rely upon the misrepresentations and omissions in order to induce Plaintiffs to invest in and purchase the LRM Bonds.

217.    Plaintiffs reasonably and justifiably relied upon the misrepresentations and omissions by investing in and purchasing the LRM Bonds.

218.    Plaintiffs would not have purchased the LRM Bonds had Dailey not made the foregoing misrepresentations and omissions.

219.    Plaintiffs have suffered damages as a direct and proximate result of Dailey's negligent misrepresentations.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter a judgment against Dailey for compensatory damages, incidental and consequential damages, punitive and exemplary damages, pre- and post-judgment interest, attorneys' fees and costs of litigation, and any other relief that the Court deems appropriate and just.

## COUNT XIII – FRAUDULENT INDUCEMENT
### (By All Plaintiffs)

220.    Plaintiffs re-allege and incorporate Paragraphs 1 through 132 as if fully set forth herein.

221.    This is an action for fraudulent inducement. This Court has original jurisdiction over the claims of those Plaintiffs whose individual damages or losses exceed $75,000, and pendent subject matter jurisdiction over the claims of the remaining Plaintiffs.

222.    In connection with the LRM Offering, Dailey misrepresented and omitted material facts concerning the LRM Offering, LRM Bonds, and LRM Official Contract to Plaintiffs, including, but not limited to, the misrepresentations and omissions alleged herein.

223.    Dailey knew that the misrepresentations were false at time such misrepresentations were communicated to Plaintiffs.

224.    Dailey knew that he was omitting material facts concerning the LRM Offering and LRM Bonds during his communications with Plaintiffs.

225.    Dailey acted with intent to deceive, manipulate, and defraud Plaintiffs, and with severe recklessness, at the time of making the foregoing misrepresentations and omissions.

226.     Dailey intended for Plaintiffs to rely on his misrepresentations and omissions in order to induce Plaintiffs to invest in and purchase the LRM Bonds and to accept the LRM Official Contract.

227.     Plaintiffs reasonably and justifiably relied upon the misrepresentations and omissions by purchasing the LRM Bonds and accepting the Official Contracts.

228.     Plaintiffs were induced into purchasing the LRM Bonds and accepting the Official Contracts as a result of the misrepresentations and omissions. Plaintiffs would not have purchased the LRM Bonds or accepted the Official Contracts had Dailey not made the misrepresentations and omissions alleged herein.

229.     Plaintiffs have suffered damages as a direct and proximate result of Dailey's fraud.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter a judgment against Dailey for rescission, compensatory damages, incidental and consequential damages, punitive and exemplary damages, pre- and post-judgment interest, attorneys' fees and costs of litigation, and any other relief that the Court deems appropriate and just.

## COUNT XIV – BREACH OF CONTRACT
### (By Plaintiff Gordon)

230.     Plaintiff Gordon re-alleges and incorporates Paragraphs 1 through 132 as if fully set forth herein.

231.     On July 15, 2013, Dailey posted the terms of the LRM Offering in the Bitcointalk Forum and noted that the LRM Offering would occur on July 17, 2013. The LRM Offering was in fact made on July 17, 2013, through BitFunder.com.

232.    As part of the LRM Offering, Dailey posted in the Bitcointalk Forum an explanation of the terms of the LRM Offering as well as the Official Contract, which reiterated those terms.

233.    Among the terms of the LRM Offering that were recited in the Official Contract, Dailey warranted that although "the initial amount is guaranteed to be a minimum of 100MH/s per bond, . . . with future installments of the company the hashrate per bond will also increase." In plain language, Dailey warranted that the rate of return would be variable in the sense that it would increase as LRM's operations grew and/or as more LRM Bonds were sold.

234.    Although the Official Contract did not contain signature lines, Dailey intended it to be, and it was, an offer to sell the LRM Bonds to investors such as Gordon. Gordon received the Official Contract (albeit without signature lines) as part of the LRM Offering through the BitFunder.com website and accepted the offer by purchasing the LRM Bonds. Gordon and Dailey understood and intended the Official Contract to set forth the terms of the agreement between Dailey and the investors, including Gordon.

235.    On or about April 30, 2014, and notwithstanding the terms of the Official Contract, Dailey unilaterally decided to change the terms of the arrangement between LRM and its investors and insisted that Gordon and the other investors execute a new agreement (the "New Contract").

236.    In an effort to coerce Gordon and the other investors into executing the New Contract in lieu of the Official Contract, Dailey informed Gordon that he would not honor the promise in the Official Contract that the rate of return on the LRM Bonds would increase with LRM's operational capacity. Instead, Dailey claimed that the terms of the Official Contract

obligated him to pay only a flat 100MH/s rate of return, and that anything above that rate of return was merely a discretionary "bonus" that he could withhold from Gordon.

237.    Pursuant to the terms of the Official Contract, Gordon was promised returns above the minimum rate of 100MH/s as LRM's operations grew, and to that point Dailey had paid Gordon returns above the minimum rate because operations had grown and/or more LRM Bonds were sold. Returns above the minimum rate were not discretionary, and Dailey wrongfully withheld, and continues to withhold, those dividends, returns, or distributions because Gordon refused to execute the New Contract.

238.    Dailey's withholding of Gordon's dividends, returns, or distributions and Dailey's unilateral repudiation of the Official Contract constituted a breach of the Official Contract.

239.    Dailey also breached the Official Contract by unilaterally imposing a three-way split of the LRM Bonds that Gordon had purchased, thereby substantially diluting their value.

240.    Dailey further breached the Official Contract by repeatedly misrepresenting and concealing the true nature and status of Gordon's investments as well as LRM's finances, operations, and legal status.

241.    As a result of Dailey's breaches, Gordon has been damaged in an amount that is substantial but unknown to Gordon because he does not know the precise amount of dividends that Dailey wrongfully has withheld from him.

**WHEREFORE**, Plaintiff Gordon respectfully requests that the Court enter a judgment against Dailey for compensatory damages, incidental and consequential damages, pre- and post-judgment interest, and costs of litigation, and any other relief that the Court deems appropriate and just.

## COUNT XV – BREACH OF CONTRACT
### (By Plaintiff Green)

242.     Plaintiff Green re-alleges and incorporates Paragraphs 1 through 132 as if fully set forth herein.

243.     On July 15, 2013, Dailey posted the terms of the LRM Offering in the Bitcointalk Forum and noted that the LRM Offering would occur on July 17, 2013. The LRM Offering was in fact made on July 17, 2013, through BitFunder.com.

244.     As part of the LRM Offering, Dailey posted in the Bitcointalk Forum an explanation of the terms of the LRM Offering as well as the Official Contract, which reiterated those terms.

245.     Among the terms of the LRM Offering that were recited in the Official Contract, Dailey warranted that although "the initial amount is guaranteed to be a minimum of 100MH/s per bond, . . . with future installments of the company the hashrate per bond will also increase." In plain language, Dailey warranted that the rate of return would be variable in the sense that it would increase as LRM's operations grew and/or as more LRM Bonds were sold .

246.     Although the Official Contract did not contain signature lines, Dailey intended it to be, and it was, an offer to sell the LRM Bonds to investors such as Green. Green received the Official Contract (albeit without signature lines) as part of the LRM Offering through the BitFunder.com website and accepted the offer by purchasing the LRM Bonds. Green and Dailey understood and intended the Official Contract to set forth the terms of the agreement between Dailey and the investors, including Green.

247.     On or about April 30, 2014, and notwithstanding the terms of the Official Contract, Dailey unilaterally decided to change the terms of the arrangement between LRM and

its investors and insisted that Green and the other investors execute a new agreement (the "New Contract").

248.    In an effort to coerce Green and the other investors into executing the New Contract in lieu of the Official Contract, Dailey informed Green that he would not honor the promise in the Official Contract that the rate of return on the LRM Bonds would increase with LRM's operational capacity. Instead, Dailey claimed that the terms of the Official Contract obligated him to pay only a flat 100MH/s rate of return, and that anything above that rate of return was merely a discretionary "bonus" that he could withhold from Green.

249.    Pursuant to the terms of the Official Contract, Green was promised returns above the minimum rate of 100MH/s as LRM's operations grew, and to that point Dailey had paid Green returns above the minimum rate because operations had grown and/or more LRM Bonds were sold. Returns above the minimum rate were not discretionary, and Dailey wrongfully withheld, and continues to withhold, those dividends, returns, or distributions because Green refused to execute the New Contract.

250.    Dailey's withholding of Green's dividends, returns, or distributions and Dailey's unilateral repudiation of the Official Contract constituted a breach of the Official Contract.

251.    Dailey also breached the Official Contract by unilaterally imposing a three-way split of the LRM Bonds that Green had purchased, thereby substantially diluting their value.

252.    Dailey further breached the Official Contract by repeatedly misrepresenting and concealing the true nature and status of Green's investments as well as LRM's finances, operations, and legal status.

253.    As a result of Dailey's breaches, Green has been damaged in an amount that is substantial but unknown to Green because he does not know the precise amount of dividends that Dailey wrongfully has withheld from him.

**WHEREFORE**, Plaintiff Green respectfully requests that the Court enter a judgment against Dailey for compensatory damages, incidental and consequential damages, pre- and post-judgment interest, and costs of litigation, and any other relief that the Court deems appropriate and just.

<u>**COUNT XVI – BREACH OF CONTRACT**</u>
**(By Plaintiff Vondrak)**

254.    Plaintiff Vondrak re-alleges and incorporates Paragraphs 1 through 132 as if fully set forth herein.

255.    On July 15, 2013, Dailey posted the terms of the LRM Offering in the Bitcointalk Forum and noted that the LRM Offering would occur on July 17, 2013. The LRM Offering was in fact made on July 17, 2013, through BitFunder.com.

256.    As part of the LRM Offering, Dailey posted in the Bitcointalk Forum an explanation of the terms of the LRM Offering as well as the Official Contract, which reiterated those terms.

257.    Among the terms of the LRM Offering that were recited in the Official Contract, Dailey warranted that although "the initial amount is guaranteed to be a minimum of 100MH/s per bond, . . . with future installments of the company the hashrate per bond will also increase." In plain language, Dailey warranted that the rate of return would be variable in the sense that it would increase as LRM's operations grew and/or as more LRM Bonds were sold .

258.    Although the Official Contract did not contain signature lines, Dailey intended it to be, and it was, an offer to sell the LRM Bonds to investors such as Vondrak. Vondrak received

the Official Contract (albeit without signature lines) as part of the LRM Offering through the BitFunder.com website and accepted the offer by purchasing the LRM Bonds. Vondrak and Dailey understood and intended the Official Contract to set forth the terms of the agreement between Dailey and the investors, including Vondrak.

259.   On or about April 30, 2014, and notwithstanding the terms of the Official Contract, Dailey unilaterally decided to change the terms of the arrangement between LRM and its investors and insisted that Vondrak and the other investors execute a new agreement (the "New Contract").

260.   In an effort to coerce Vondrak and the other investors into executing the New Contract in lieu of the Official Contract, Dailey informed Vondrak that he would not honor the promise in the Official Contract that the rate of return on the LRM Bonds would increase with LRM's operational capacity. Instead, Dailey claimed that the terms of the Official Contract obligated him to pay only a flat 100MH/s rate of return, and that anything above that rate of return was merely a discretionary "bonus" that he could withhold from Vondrak.

261.   Pursuant to the terms of the Official Contract, Vondrak was promised returns above the minimum rate of 100MH/s as LRM's operations grew, and to that point Dailey had paid Vondrak returns above the minimum rate because operations had grown and/or more LRM Bonds were sold. Returns above the minimum rate were not discretionary, and Dailey wrongfully withheld, and continues to withhold, those dividends, returns, or distributions because Vondrak refused to execute the New Contract.

262.   Dailey's withholding of Vondrak's dividends, returns, or distributions and Dailey's unilateral repudiation of the Official Contract constituted a breach of the Official Contract.

263.    Dailey also breached the Official Contract by unilaterally imposing a three-way split of the LRM Bonds that Vondrak had purchased, thereby substantially diluting their value.

264.    Dailey further breached the Official Contract by repeatedly misrepresenting and concealing the true nature and status of Vondrak's investments as well as LRM's finances, operations, and legal status.

265.    As a result of Dailey's breaches, Vondrak has been damaged in an amount that is substantial but unknown to Vondrak because he does not know the precise amount of dividends that Dailey wrongfully has withheld from him.

**WHEREFORE**, Plaintiff Vondrak respectfully requests that the Court enter a judgment against Dailey for compensatory damages, incidental and consequential damages, pre- and post-judgment interest, and costs of litigation, and any other relief that the Court deems appropriate and just.

## COUNT XVII – BREACH OF CONTRACT
### (By Plaintiff Lobb)

266.    Plaintiff Lobb re-alleges and incorporates Paragraphs 1 through 132 as if fully set forth herein.

267.    On July 15, 2013, Dailey posted the terms of the LRM Offering in the Bitcointalk Forum and noted that the LRM Offering would occur on July 17, 2013. The LRM Offering was in fact made on July 17, 2013, through BitFunder.com.

268.    As part of the LRM Offering, Dailey posted in the Bitcointalk Forum an explanation of the terms of the LRM Offering as well as the Official Contract, which reiterated those terms.

269.    Among the terms of the LRM Offering that were recited in the Official Contract, Dailey warranted that although "the initial amount is guaranteed to be a minimum of 100MH/s

per bond, . . . with future installments of the company the hashrate per bond will also increase." In plain language, Dailey warranted that the rate of return would be variable in the sense that it would increase as LRM's operations grew and/or as more LRM Bonds were sold .

270.    Although the Official Contract did not contain signature lines, Dailey intended it to be, and it was, an offer to sell the LRM Bonds to investors such as Lobb. Lobb received the Official Contract (albeit without signature lines) as part of the LRM Offering through the BitFunder.com website and accepted the offer by purchasing the LRM Bonds. Lobb and Dailey understood and intended the Official Contract to set forth the terms of the agreement between Dailey and the investors, including Lobb.

271.    On or about April 30, 2014, and notwithstanding the terms of the Official Contract, Dailey unilaterally decided to change the terms of the arrangement between LRM and its investors and insisted that Lobb and the other investors execute a new agreement (the "New Contract").

272.    In an effort to coerce Lobb and the other investors into executing the New Contract in lieu of the Official Contract, Dailey informed Lobb that he would not honor the promise in the Official Contract that the rate of return on the LRM Bonds would increase with LRM's operational capacity. Instead, Dailey claimed that the terms of the Official Contract obligated him to pay only a flat 100MH/s rate of return, and that anything above that rate of return was merely a discretionary "bonus" that he could withhold from Lobb.

273.    Pursuant to the terms of the Official Contract, Lobb was promised returns above the minimum rate of 100MH/s as LRM's operations grew, and to that point Dailey had paid Lobb returns above the minimum rate because operations had grown and/or more LRM Bonds were sold. Returns above the minimum rate were not discretionary, and Dailey wrongfully

withheld, and continues to withhold, those dividends, returns, or distributions because Lobb refused to execute the New Contract.

274.   Dailey's withholding of Lobb's dividends, returns, or distributions and Dailey's unilateral repudiation of the Official Contract constituted a breach of the Official Contract.

275.   Dailey also breached the Official Contract by unilaterally imposing a three-way split of the LRM Bonds that Lobb had purchased, thereby substantially diluting their value.

276.   Dailey further breached the Official Contract by repeatedly misrepresenting and concealing the true nature and status of Lobb's investments as well as LRM's finances, operations, and legal status.

277.   As a result of Dailey's breaches, Lobb has been damaged in an amount that is substantial but unknown to Lobb because he does not know the precise amount of dividends that Dailey wrongfully has withheld from him.

**WHEREFORE**, Plaintiff Lobb respectfully requests that the Court enter a judgment against Dailey for compensatory damages, incidental and consequential damages, pre- and post-judgment interest, and costs of litigation, and any other relief that the Court deems appropriate and just.

**COUNT XVIII – BREACH OF CONTRACT**
**(By Plaintiff Piper)**

278.   Plaintiff Piper re-alleges and incorporates Paragraphs 1 through 132 as if fully set forth herein.

279.   On July 15, 2013, Dailey posted the terms of the LRM Offering in the Bitcointalk Forum and noted that the LRM Offering would occur on July 17, 2013. The LRM Offering was in fact made on July 17, 2013, through BitFunder.com.

280.    As part of the LRM Offering, Dailey posted in the Bitcointalk Forum an explanation of the terms of the LRM Offering as well as the Official Contract, which reiterated those terms.

281.    Among the terms of the LRM Offering that were recited in the Official Contract, Dailey warranted that although "the initial amount is guaranteed to be a minimum of 100MH/s per bond, . . . with future installments of the company the hashrate per bond will also increase." In plain language, Dailey warranted that the rate of return would be variable in the sense that it would increase as LRM's operations grew and/or as more LRM Bonds were sold .

282.    Although the Official Contract did not contain signature lines, Dailey intended it to be, and it was, an offer to sell the LRM Bonds to investors such as Piper. Piper received the Official Contract (albeit without signature lines) as part of the LRM Offering through the BitFunder.com website and accepted the offer by purchasing the LRM Bonds. Piper and Dailey understood and intended the Official Contract to set forth the terms of the agreement between Dailey and the investors, including Piper.

283.    On or about April 30, 2014, and notwithstanding the terms of the Official Contract, Dailey unilaterally decided to change the terms of the arrangement between LRM and its investors and insisted that Piper and the other investors execute a new agreement (the "New Contract").

284.    In an effort to coerce Piper and the other investors into executing the New Contract in lieu of the Official Contract, Dailey informed Piper that he would not honor the promise in the Official Contract that the rate of return on the LRM Bonds would increase with LRM's operational capacity. Instead, Dailey claimed that the terms of the Official Contract

obligated him to pay only a flat 100MH/s rate of return, and that anything above that rate of return was merely a discretionary "bonus" that he could withhold from Piper.

285.    Pursuant to the terms of the Official Contract, Piper was promised returns above the minimum rate of 100MH/s as LRM's operations grew, and to that point Dailey had paid Piper returns above the minimum rate because operations had grown and/or more LRM Bonds were sold. Returns above the minimum rate were not discretionary, and Dailey wrongfully withheld, and continues to withhold, those dividends, returns, or distributions because Piper refused to execute the New Contract.

286.    Dailey's withholding of Piper's dividends, returns, or distributions and Dailey's unilateral repudiation of the Official Contract constituted a breach of the Official Contract.

287.    Dailey also breached the Official Contract by unilaterally imposing a three-way split of the LRM Bonds that Piper had purchased, thereby substantially diluting their value.

288.    Dailey further breached the Official Contract by repeatedly misrepresenting and concealing the true nature and status of Piper's investments as well as LRM's finances, operations, and legal status.

289.    As a result of Dailey's breaches, Piper has been damaged in an amount that is substantial but unknown to Piper because he does not know the precise amount of dividends that Dailey wrongfully has withheld from him.

**WHEREFORE**, Plaintiff Piper respectfully requests that the Court enter a judgment against Dailey for compensatory damages, incidental and consequential damages, pre- and post-judgment interest, and costs of litigation, and any other relief that the Court deems appropriate and just.

## COUNT XIX – BREACH OF CONTRACT
### (By Plaintiff Galido)

290.    Plaintiff Galido re-alleges and incorporates Paragraphs 1 through 132 as if fully set forth herein.

291.    On July 15, 2013, Dailey posted the terms of the LRM Offering in the Bitcointalk Forum and noted that the LRM Offering would occur on July 17, 2013. The LRM Offering was in fact made on July 17, 2013, through BitFunder.com.

292.    As part of the LRM Offering, Dailey posted in the Bitcointalk Forum an explanation of the terms of the LRM Offering as well as the Official Contract, which reiterated those terms.

293.    Among the terms of the LRM Offering that were recited in the Official Contract, Dailey warranted that although "the initial amount is guaranteed to be a minimum of 100MH/s per bond, . . . with future installments of the company the hashrate per bond will also increase." In plain language, Dailey warranted that the rate of return would be variable in the sense that it would increase as LRM's operations grew and/or as more LRM Bonds were sold .

294.    Although the Official Contract did not contain signature lines, Dailey intended it to be, and it was, an offer to sell the LRM Bonds to investors such as Galido. Galido received the Official Contract (albeit without signature lines) as part of the LRM Offering through the BitFunder.com website and accepted the offer by purchasing the LRM Bonds. Galido and Dailey understood and intended the Official Contract to set forth the terms of the agreement between Dailey and the investors, including Galido.

295.    On or about April 30, 2014, and notwithstanding the terms of the Official Contract, Dailey unilaterally decided to change the terms of the arrangement between LRM and

its investors and insisted that Galido and the other investors execute a new agreement (the "New Contract").

296.    In an effort to coerce Galido and the other investors into executing the New Contract in lieu of the Official Contract, Dailey informed Galido that he would not honor the promise in the Official Contract that the rate of return on the LRM Bonds would increase with LRM's operational capacity. Instead, Dailey claimed that the terms of the Official Contract obligated him to pay only a flat 100MH/s rate of return, and that anything above that rate of return was merely a discretionary "bonus" that he could withhold from Galido.

297.    Pursuant to the terms of the Official Contract, Galido was promised returns above the minimum rate of 100MH/s as LRM's operations grew, and to that point Dailey had paid Galido returns above the minimum rate because operations had grown and/or more LRM Bonds were sold. Returns above the minimum rate were not discretionary, and Dailey wrongfully withheld, and continues to withhold, those dividends, returns, or distributions because Galido refused to execute the New Contract.

298.    Dailey's withholding of Galido's dividends, returns, or distributions and Dailey's unilateral repudiation of the Official Contract constituted a breach of the Official Contract.

299.    Dailey also breached the Official Contract by unilaterally imposing a three-way split of the LRM Bonds that Galido had purchased, thereby substantially diluting their value.

300.    Dailey further breached the Official Contract by repeatedly misrepresenting and concealing the true nature and status of Galido's investments as well as LRM's finances, operations, and legal status.

301.     As a result of Dailey's breaches, Galido has been damaged in an amount that is substantial but unknown to Galido because he does not know the precise amount of dividends that Dailey wrongfully has withheld from him.

**WHEREFORE**, Plaintiff Galido respectfully requests that the Court enter a judgment against Dailey for compensatory damages, incidental and consequential damages, pre- and post-judgment interest, and costs of litigation, and any other relief that the Court deems appropriate and just.

## COUNT XX – BREACH OF CONTRACT
### (By Plaintiff Boehler)

302.     Plaintiff Boehler re-alleges and incorporates Paragraphs 1 through 132 as if fully set forth herein.

303.     On July 15, 2013, Dailey posted the terms of the LRM Offering in the Bitcointalk Forum and noted that the LRM Offering would occur on July 17, 2013. The LRM Offering was in fact made on July 17, 2013, through BitFunder.com.

304.     As part of the LRM Offering, Dailey posted in the Bitcointalk Forum an explanation of the terms of the LRM Offering as well as the Official Contract, which reiterated those terms.

305.     Among the terms of the LRM Offering that were recited in the Official Contract, Dailey warranted that although "the initial amount is guaranteed to be a minimum of 100MH/s per bond, . . . with future installments of the company the hashrate per bond will also increase." In plain language, Dailey warranted that the rate of return would be variable in the sense that it would increase as LRM's operations grew and/or as more LRM Bonds were sold .

306.     Although the Official Contract did not contain signature lines, Dailey intended it to be, and it was, an offer to sell the LRM Bonds to investors such as Boehler. Boehler received

the Official Contract (albeit without signature lines) as part of the LRM Offering through the BitFunder.com website and accepted the offer by purchasing the LRM Bonds. Boehler and Dailey understood and intended the Official Contract to set forth the terms of the agreement between Dailey and the investors, including Boehler.

307.    On or about April 30, 2014, and notwithstanding the terms of the Official Contract, Dailey unilaterally decided to change the terms of the arrangement between LRM and its investors and insisted that Boehler and the other investors execute a new agreement (the "New Contract").

308.    In an effort to coerce Boehler and the other investors into executing the New Contract in lieu of the Official Contract, Dailey informed Boehler that he would not honor the promise in the Official Contract that the rate of return on the LRM Bonds would increase with LRM's operational capacity. Instead, Dailey claimed that the terms of the Official Contract obligated him to pay only a flat 100MH/s rate of return, and that anything above that rate of return was merely a discretionary "bonus" that he could withhold from Boehler.

309.    Pursuant to the terms of the Official Contract, Boehler was promised returns above the minimum rate of 100MH/s as LRM's operations grew, and to that point Dailey had paid Boehler returns above the minimum rate because operations had grown and/or LRM Bonds were sold. Returns above the minimum rate were not discretionary, and Dailey wrongfully withheld, and continues to withhold, those dividends, returns, or distributions because Boehler refused to execute the New Contract.

310.    Dailey's withholding of Boehler's dividends, returns, or distributions and Dailey's unilateral repudiation of the Official Contract constituted a breach of the Official Contract.

311.    Dailey also breached the Official Contract by unilaterally imposing a three-way split of the LRM Bonds that Boehler had purchased, thereby substantially diluting their value.

312.    Dailey further breached the Official Contract by repeatedly misrepresenting and concealing the true nature and status of Boehler's investments as well as LRM's finances, operations, and legal status.

313.    As a result of Dailey's breaches, Boehler has been damaged in an amount that is substantial but unknown to Boehler because he does not know the precise amount of dividends that Dailey wrongfully has withheld from him.

**WHEREFORE**, Plaintiff Boehler respectfully requests that the Court enter a judgment against Dailey for compensatory damages, incidental and consequential damages, pre- and post-judgment interest, and costs of litigation, and any other relief that the Court deems appropriate and just.

## COUNT XXI – BREACH OF CONTRACT
### (By Plaintiff Fisher-Levine)

314.    Plaintiff Fisher-Levine re-alleges and incorporates Paragraphs 1 through 132 as if fully set forth herein.

315.    On July 15, 2013, Dailey posted the terms of the LRM Offering in the Bitcointalk Forum and noted that the LRM Offering would occur on July 17, 2013. The LRM Offering was in fact made on July 17, 2013, through BitFunder.com.

316.    As part of the LRM Offering, Dailey posted in the Bitcointalk Forum an explanation of the terms of the LRM Offering as well as the Official Contract, which reiterated those terms.

317.    Among the terms of the LRM Offering that were recited in the Official Contract, Dailey warranted that although "the initial amount is guaranteed to be a minimum of 100MH/s

per bond, . . . with future installments of the company the hashrate per bond will also increase."

In plain language, Dailey warranted that the rate of return would be variable in the sense that it

would increase as LRM's operations grew and/or as more LRM Bonds were sold .

318.    Although the Official Contract did not contain signature lines, Dailey intended it

to be, and it was, an offer to sell the LRM Bonds to investors such as Fisher-Levine. Fisher-

Levine received the Official Contract (albeit without signature lines) as part of the LRM Offering

through the BitFunder.com website and accepted the offer by purchasing the LRM Bonds.

Fisher-Levine and Dailey understood and intended the Official Contract to set forth the terms of

the agreement between Dailey and the investors, including Fisher-Levine.

319.    On or about April 30, 2014, and notwithstanding the terms of the Official

Contract, Dailey unilaterally decided to change the terms of the arrangement between LRM and

its investors and insisted that Fisher-Levine and the other investors execute a new agreement (the

"New Contract").

320.    In an effort to coerce Fisher-Levine and the other investors into executing the

New Contract in lieu of the Official Contract, Dailey informed Fisher-Levine that he would not

honor the promise in the Official Contract that the rate of return on the LRM Bonds would

increase with LRM's operational capacity. Instead, Dailey claimed that the terms of the Official

Contract obligated him to pay only a flat 100MH/s rate of return, and that anything above that

rate of return was merely a discretionary "bonus" that he could withhold from Fisher-Levine.

321.    Pursuant to the terms of the Official Contract, Fisher-Levine was promised returns

above the minimum rate of 100MH/s as LRM's operations grew, and to that point Dailey had

paid Fisher-Levine returns above the minimum rate because operations had grown and/or more

LRM Bonds were sold. Returns above the minimum rate were not discretionary, and Dailey

wrongfully withheld, and continues to withhold, those dividends, returns, or distributions because Fisher-Levine refused to execute the New Contract.

322.    Dailey's withholding of Fisher-Levine dividends, returns, or distributions and Dailey's unilateral repudiation of the Official Contract constituted a breach of the Official Contract.

323.    Dailey also breached the Official Contract by unilaterally imposing a three-way split of the LRM Bonds that Fisher-Levine had purchased, thereby substantially diluting their value.

324.    Dailey further breached the Official Contract by repeatedly misrepresenting and concealing the true nature and status of Fisher-Levine's investments as well as LRM's finances, operations, and legal status.

325.    As a result of Dailey's breaches, Fisher-Levine has been damaged in an amount that is substantial but unknown to Fisher-Levine because he does not know the precise amount of dividends that Dailey wrongfully has withheld from him.

**WHEREFORE**, Plaintiff Fisher-Levine respectfully requests that the Court enter a judgment against Dailey for compensatory damages, incidental and consequential damages, pre- and post-judgment interest, and costs of litigation, and any other relief that the Court deems appropriate and just.

## COUNT XXII – BREACH OF CONTRACT
### (By Plaintiff Flachsbart)

326.    Plaintiff Flachsbart re-alleges and incorporates Paragraphs 1 through 132 as if fully set forth herein.

327.    On July 15, 2013, Dailey posted the terms of the LRM Offering in the Bitcointalk Forum and noted that the LRM Offering would occur on July 17, 2013. The LRM Offering was in fact made on July 17, 2013, through BitFunder.com.

328.    As part of the LRM Offering, Dailey posted in the Bitcointalk Forum an explanation of the terms of the LRM Offering as well as the Official Contract, which reiterated those terms.

329.    Among the terms of the LRM Offering that were recited in the Official Contract, Dailey warranted that although "the initial amount is guaranteed to be a minimum of 100MH/s per bond, . . . with future installments of the company the hashrate per bond will also increase." In plain language, Dailey warranted that the rate of return would be variable in the sense that it would increase as LRM's operations grew and/or as more LRM Bonds were sold .

330.    Although the Official Contract did not contain signature lines, Dailey intended it to be, and it was, an offer to sell the LRM Bonds to investors such as Flachsbart. Flachsbart received the Official Contract (albeit without signature lines) as part of the LRM Offering through the BitFunder.com website and accepted the offer by purchasing the LRM Bonds. Flachsbart and Dailey understood and intended the Official Contract to set forth the terms of the agreement between Dailey and the investors, including Flachsbart.

331.    On or about April 30, 2014, and notwithstanding the terms of the Official Contract, Dailey unilaterally decided to change the terms of the arrangement between LRM and its investors and insisted that Flachsbart and the other investors execute a new agreement (the "New Contract").

332.    In an effort to coerce Flachsbart and the other investors into executing the New Contract in lieu of the Official Contract, Dailey informed Flachsbart that he would not honor the

promise in the Official Contract that the rate of return on the LRM Bonds would increase with LRM's operational capacity. Instead, Dailey claimed that the terms of the Official Contract obligated him to pay only a flat 100MH/s rate of return, and that anything above that rate of return was merely a discretionary "bonus" that he could withhold from Flachsbart.

333.   Pursuant to the terms of the Official Contract, Flachsbart was promised returns above the minimum rate of 100MH/s as LRM's operations grew, and to that point Dailey had paid Flachsbart returns above the minimum rate because operations had grown and/or more LRM Bonds were sold. Returns above the minimum rate were not discretionary, and Dailey wrongfully withheld, and continues to withhold, those dividends, returns, or distributions because Flachsbart refused to execute the New Contract.

334.   Dailey's withholding of Flachsbart's dividends, returns, or distributions and Dailey's unilateral repudiation of the Official Contract constituted a breach of the Official Contract.

335.   Dailey also breached the Official Contract by unilaterally imposing a three-way split of the LRM Bonds that Flachsbart had purchased, thereby substantially diluting their value.

336.   Dailey further breached the Official Contract by repeatedly misrepresenting and concealing the true nature and status of Flachsbart's investments as well as LRM's finances, operations, and legal status.

337.   As a result of Dailey's breaches, Flachsbart has been damaged in an amount that is substantial but unknown to Flachsbart because he does not know the precise amount of dividends that Dailey wrongfully has withheld from him.

**WHEREFORE**, Plaintiff Flachsbart respectfully requests that the Court enter a judgment against Dailey for compensatory damages, incidental and consequential damages, pre-

and post-judgment interest, and costs of litigation, and any other relief that the Court deems appropriate and just.

**COUNT XXIII – BREACH OF CONTRACT**
**(By Plaintiff Henderson)**

338.    Plaintiff Henderson re-alleges and incorporates Paragraphs 1 through 132 as if fully set forth herein.

339.    On July 15, 2013, Dailey posted the terms of the LRM Offering in the Bitcointalk Forum and noted that the LRM Offering would occur on July 17, 2013. The LRM Offering was in fact made on July 17, 2013, through BitFunder.com.

340.    As part of the LRM Offering, Dailey posted in the Bitcointalk Forum an explanation of the terms of the LRM Offering as well as the Official Contract, which reiterated those terms.

341.    Among the terms of the LRM Offering that were recited in the Official Contract, Dailey warranted that although "the initial amount is guaranteed to be a minimum of 100MH/s per bond, . . . with future installments of the company the hashrate per bond will also increase." In plain language, Dailey warranted that the rate of return would be variable in the sense that it would increase as LRM's operations grew and/or as more LRM Bonds were sold .

342.    Although the Official Contract did not contain signature lines, Dailey intended it to be, and it was, an offer to sell the LRM Bonds to investors such as Henderson. Henderson received the Official Contract (albeit without signature lines) as part of the LRM Offering through the BitFunder.com website and accepted the offer by purchasing the LRM Bonds. Henderson and Dailey understood and intended the Official Contract to set forth the terms of the agreement between Dailey and the investors, including Henderson.

343.    On or about April 30, 2014, and notwithstanding the terms of the Official Contract, Dailey unilaterally decided to change the terms of the arrangement between LRM and its investors and insisted that Henderson and the other investors execute a new agreement (the "New Contract").

344.    In an effort to coerce Henderson and the other investors into executing the New Contract in lieu of the Official Contract, Dailey informed Henderson that he would not honor the promise in the Official Contract that the rate of return on the LRM Bonds would increase with LRM's operational capacity. Instead, Dailey claimed that the terms of the Official Contract obligated him to pay only a flat 100MH/s rate of return, and that anything above that rate of return was merely a discretionary "bonus" that he could withhold from Henderson.

345.    Pursuant to the terms of the Official Contract, Henderson was promised returns above the minimum rate of 100MH/s as LRM's operations grew, and to that point Dailey had paid Henderson returns above the minimum rate because operations had grown and/or more LRM Bonds were sold. Returns above the minimum rate were not discretionary, and Dailey wrongfully withheld, and continues to withhold, those dividends, returns, or distributions because Henderson refused to execute the New Contract.

346.    Dailey's withholding of Henderson's dividends, returns, or distributions and Dailey's unilateral repudiation of the Official Contract constituted a breach of the Official Contract.

347.    Dailey also breached the Official Contract by unilaterally imposing a three-way split of the LRM Bonds that Henderson had purchased, thereby substantially diluting their value.

348.    Dailey further breached the Official Contract by repeatedly misrepresenting and concealing the true nature and status of Henderson's investments as well as LRM's finances, operations, and legal status.

349.    As a result of Dailey's breaches, Henderson has been damaged in an amount that is substantial but unknown to Henderson because he does not know the precise amount of dividends that Dailey wrongfully has withheld from him.

**WHEREFORE**, Plaintiff Henderson respectfully requests that the Court enter a judgment against Dailey for compensatory damages, incidental and consequential damages, pre- and post-judgment interest, and costs of litigation, and any other relief that the Court deems appropriate and just.

## COUNT XXIV – UNJUST ENRICHMENT
### (All Plaintiffs)

350.    Plaintiffs re-allege and incorporate Paragraphs 1 through 132 as if fully set forth herein.

351.    Plaintiffs conferred benefits on Dailey in the form of Bitcoins and equipment in order to invest in the LRM Bonds.

352.    Dailey has failed to adequately compensate Plaintiffs for their investment in and purchase of the LRM Bonds.

353.    Dailey was aware that Plaintiffs expected to be compensated for the benefits that Plaintiffs conferred upon Dailey.

354.    Dailey has retained the benefits conferred by Plaintiffs notwithstanding Dailey's misrepresentations, omissions and failure to honor the terms of the parties' contracts.

355.    It is inequitable for Dailey to continue to retain the benefits conferred by Plaintiffs in connection with the LRM Offering without compensating Plaintiffs.

356.     Dailey has been unjustly enriched by Plaintiffs to Plaintiffs' detriment.

WHEREFORE, Plaintiffs respectfully request that the Court enter a judgment against Dailey for compensatory damages, incidental and consequential damages, pre- and post-judgment interest, and costs of litigation, and any other relief that the Court deems appropriate and just.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all issues and claims so triable.

## **CERTIFICATION PURSUANT TO L. CIV. R. 11.2**

I hereby certify to the best of my knowledge, information and belief that the matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.


Dated: April 19, 2017

Respectfully submitted,


**BRESSLER, AMERY & ROSS, P.C.**
**Counsel for Plaintiffs**
By: */s/ Michael T. Hensley, Esq.*
          Michael T. Hensley, Esq.

**MCDONALD HOPKINS LLC**
**Counsel for Plaintiffs**
By: */s/ Christopher B. Hopkins, Esq.*

Christopher B. Hopkins, Esq. (*pro hac vice*)
Florida Bar No:  116122
chopkins@mcdonaldhopkins.com
McDonald Hopkins LLC
505 S. Flagler Drive, Suite 300
West Palm Beach, Florida 33401
(561) 472-2121
(561) 472-2122 (fax)
Secondary E-Mail:

ddominguez@mcdonaldhopkins.com
ltimoteo@mcdonaldhopkins.com
wpbpleadings@mcdonaldhopkins.com